JOHNSON & WEAVER, LLP
FRANK J. JOHNSON (174882)
SHAWN E. FIELDS (255267)
110 West A Street, Suite 750
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

Lead Counsel for Plaintiff

FILED
CLERK, U.S. DISTRICT COURT

MAR - 5 2012

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE MANNKIND CORPORATION DERIVATIVE LITIGATION | Lead Case No: 11-cv-05003-GAF-SSx |
| | **FIRST AMENDED VERIFIED CONSOLIDATED DERIVATIVE COMPLAINT** |
| This Document Relates To: ALL ACTIONS. | **JURY TRIAL DEMANDED** |
| | (Derivative Action) |

FILED BY FAX

RECEIVED
BUT NOT FILED

MAR - 5 2012

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN
BY

First Amended Verified Consolidated
Derivative Complaint

Case No. 11-cv-05003-GAF-SSx

# TABLE OF CONTENTS

I.      OVERVIEW OF THE ACTION ....................................................................1

II.     JURISDICTION AND VENUE ...................................................................4

III.    THE PARTIES ...........................................................................................4

        A.      Plaintiff...........................................................................................4

        B.      Nominal Defendant MannKind .....................................................4

        C.      Individual Defendants....................................................................4

IV.     SUBSTANTIVE ALLEGATIONS...............................................................6

        A.      AFREZZA Is MannKind's Sole Core Product................................6

        B.      MannKind's Failed Attempts To Obtain Regulatory Approval.........9

        C.      The Individual Defendants Were Motivated To Artificially
                Inflate The Company's Stock Price Above $6.50 Per Share........... 19

        D.      The Individual Defendants Mislead Investors About The
                Dreamboat Approval Process ........................................................ 22

        E.      The Truth Emerges ...................................................................... 48

V.      INSIDER SELLING ALLEGATIONS ....................................................... 51

VI.     DUTIES OF THE INDIVIDUAL DEFENDANTS................................... 52

        A.      Fiduciary Duties........................................................................... 52

        B.      Audit Committee Duties................................................................ 52

        C.      Code Of Business Conduct And Ethics........................................... 55

        D.      Control, Access, And Authority .................................................... 59

        E.      Reasonable And Prudent Supervision........................................... 60

VII.    BREACHES OF DUTIES........................................................................... 61

VIII.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED
        ACTION................................................................................................... 61

IX.     DAMAGES TO MANNKIND ................................................................... 63

X.      DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ............... 64

        A.      Demand Is Futile As To Defendant Mann...................................... 65

i

|   |   |   |   |
|---|---|---|---|
| B. | Demand Is Futile As To Defendant Edstrom | ................................... | 67 |
| C. | Demand Is Futile As To Defendant MacCallum | .............................. | 68 |
| D. | Demand Is Futile As To Defendant Friedman | .................................. | 75 |
| E. | Demand Is Futile As To Defendant Shannon | ................................... | 80 |
| F. | Demand Is Futile As To Defendant Cohen | ....................................... | 84 |
| G. | Demand Is Futile As To Defendant Nordhoff | .................................. | 88 |
| H. | Demand Is Futile As To Defendant Consiglio | ................................. | 92 |
| I. | Demand Is Futile As To Defendant Kresa | ........................................ | 96 |
| J. | Demand Is Futile Because The Entire Board Is Beholden To Mann And Cannot Independently Consider A Demand | ............... | 100 |
| K. | Demand Is Futile As To All Of The Director Defendants For Additional Reasons | ............................................................. | 102 |

COUNT I ..................................................................................... 105

COUNT II .................................................................................... 106

COUNT III................................................................................... 106

COUNT IV .................................................................................. 108

COUNT V..................................................................................... 108

XI.    PRAYER FOR RELIEF........................................................... 109

XII.   JURY DEMAND ..................................................................... 111

ii

This shareholder derivative action arises out of the breaches of fiduciary duties of certain officers and directors of MannKind Corporation ("MannKind" or the "Company"). In preparation for this First Amended Verified Consolidated Derivative Complaint, Plaintiff carefully reviewed this Court's Order granting Defendants' Motion to Dismiss, and amended his complaint accordingly to address the deficiencies this Court noted in that complaint. In particular, Plaintiff carefully reviewed each of MannKind's public filings, press releases, conference call transcripts, and other publicly available documents, and used information garnered from that research and elsewhere to substantially augment Plaintiff's substantive allegations and allegations that any litigation demand on the Company's Board of Directors would have been a futile and wasteful act.

## I.    OVERVIEW OF THE ACTION

1.    Plaintiff, a shareholder of MannKind Corporation ("MannKind" or the "Company"), brings this shareholder derivative lawsuit against certain officers and directors of MannKind for breaching their fiduciary duties to the Company by issuing false and misleading statements beginning in May 2010.

2.    MannKind is a biopharmaceutical company that focuses on the discovery, development and commercialization of therapeutic products for diseases such as diabetes and cancer. The Company's value rests almost entirely on the prospects of its lead product candidate, an inhalable insulin product called AFREZZA. AFREZZA is under clinical investigation for the treatment of adults with Type 1 or Type 2 diabetes for the control of hyperglycemia. AFREZZA is a combination drug product as it combines a drug (a powderized form of human insulin) with a delivery device (a portable plastic inhaler).

3.    If treatment using AFREZZA is ultimately approved by the U.S. Food and Drug Administration ("FDA"), diabetes patients will be able to inhale insulin before a meal. And if MannKind can successfully market an inhaled

1

Verified Consolidated Derivative            Case No. 11-cv-05003-GAF-SSx
Complaint

insulin drug, it could appeal to people suffering from diabetes who prefer an inhaled treatment to needles. Success, however, has so far proven elusive as pharmaceutical giant, Pfizer, previously failed in its attempt to market an inhaled insulin treatment.

4.    The Company is in its development stage and has incurred $1.7 billion in losses since its inception in 1991. To date, the Company has not generated any product revenues and has funded its operations primarily through the sale of equity securities and convertible debt securities and borrowings under a related party loan. As a consequence, the Company has constantly sought out new investors to provide additional financing.

5.    The Company is controlled and dominated by Alfred Mann - the founder, Chief Executive Officer, Chairman of the Board, and majority shareholder with over 51 million shares of MannKind stock. He has voting control over 39.4% of the Company's outstanding stock. In addition, through The Mann Group, he has agreed to loan the Company up to $350 million. And as of July 31, 2010, he had loaned the Company a staggering $252 million. Alfred Mann can afford such financing as he was ranked 277th on Forbes 400 Wealthiest Americans in 2009.

6.    Alfred Mann also entered into a common stock purchase agreement with the Company which obligated him under certain conditions to purchase up to 700,000 shares of common stock at a fixed price of $7.15 a share once every 14 days for roughly 50 weeks. In other words, Alfred Mann has a tremendous incentive to maintain a high share price for the Company's stock.

7.    In order to maintain Alfred Mann's investment in the Company and attract new investors, the Individual Defendants (as defined in ¶30) began making false and misleading statements in May 2010 about the Company's efforts to obtain FDA approval for AFREZZA. The Individual Defendants'

2

First Amended Verified Consolidated Derivative Complaint          Case No. 11-cv-05003-GAF-SSx

misrepresentations allowed the Company to inflate its stock price, raise hundreds of millions in capital, attract the interest of potential partners, and maintain the investment grade of Alfred Mann's equity and debt interests in the Company.

8.    Because of the Individual Defendants' false statements, MannKind's stock traded at artificially inflated prices, trading as high as $9.83 per share on January 18, 2011.  On January 18, 2011, the FDA issued a response to MannKind about the Company's New Drug Application ("NDA") for AFREZZA.  The FDA rejected AFREZZA and requested two additional clinical trials with the inhaler.

9.    After the market closed on January 19, 2011, the Individual Defendants revealed the truth about AFREZZA and disclosed selected portions of the FDA's letter to the public.  Based on this news, MannKind's stock plummeted $2.94 per share to close at $6.17 per share on January 20, 2011 – a decline of 32% in just one day.  The stock continued its descent, closing as low as $4.74 on February 1, 2011.

10.    As a consequence of the false representations regarding the Company's ability to receive FDA approval for AFREZZA, MannKind is the target of several class actions alleging securities fraud.

11.    Plaintiff brings this derivative action to (a) recover damages against the Individual Defendants for the benefit of the Company and (b) require the Company to reform and improve its corporate governance and internal procedures to protect the Company and its shareholders from a repeat of the damaging events described below.  Plaintiff did not make a demand upon the Company to bring suit because the Company is dominated by Alfred Mann and the Board of Directors was complicit in Alfred Mann's scheme to falsely represent the prospects of FDA approval for AFREZZA.

3

First Amended Verified Consolidated
Derivative Complaint

Case No. 11-cv-05003-GAF-SSx

## II.    JURISDICTION AND VENUE

12.    Jurisdiction is conferred by 28 U.S.C § 1332.  There is complete diversity among the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

13.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because MannKind maintains its principal executive offices in this district, one or more of the Individual Defendants reside in this district, a substantial portion of the transactions and wrongs complained of herein -- including the Individual Defendants' primary participation in the wrongful acts detailed herein -- occurred in this district, and the Individual Defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

## III.    THE PARTIES

### A.    Plaintiff

14.    Plaintiff Donald Talley is a current shareholder of MannKind, was a shareholder of MannKind at the time of the transactions and events complained of herein, and has continuously held the stock.  Talley is a citizen of Missouri.

### B.    Nominal Defendant MannKind

15.    Nominal Defendant MannKind is a Delaware corporation with its company headquarters at 28903 North Avenue Paine, Valencia, California 91355.  As of April 12, 2011, MannKind had approximately 130,000,000 outstanding shares.  MannKind is traded on the NASDAQ under the ticker symbol "MNKD."

### C.    Individual Defendants

16.    Defendant Alfred E. Mann ("Mann") has been a director since April 1999, the Chairman of the Board since December 2001, and the Chief Executive

4

1   Officer since October 2003. He is also the Company's founder and a majority
2   shareholder. Upon information and belief, Mann is a citizen of California.

3       17.    Defendant Hakan S. Edstrom ("Edstrom") has been the President
4   and Chief Operating Officer since April 2001 and has served as a director since
5   December 2001. Upon information and belief, Edstrom is a citizen of California.

6       18.    Defendant Matthew J. Pfeffer ("Pfeffer") has been the Company's
7   Chief Financial Officer and Corporate Vice President since April 2008. After
8   MannKind received the FDA's response letter but before MannKind disclosed
9   the letter to the public, Pfeffer sold 6,300 shares of his personally held
10  MannKind stock. Upon information and belief, Pfeffer is a citizen of California.

11      19.    Defendant Peter C. Richardson ("Richardson") has been the
12  Company's Chief Scientific Officer and Corporate Vice President since October
13  2005. Upon information and belief, Richardson is a citizen of New Jersey.

14      20.    Defendant Barry E. Cohen ("Cohen") has served as a director of the
15  Company since May 2007. Upon information and belief, Cohen is a citizen of
16  New York.

17      21.    Defendant Ronald Consiglio ("Consiglio") has served as a director
18  of the Company since October 2003. He is the Chairman of the Audit
19  Committee. Upon information and belief, Consiglio is a citizen of California.

20      22.    Defendant Michael Friedman ("Friedman") has served as a director
21  since December 2003. Upon information and belief, Friedman is a citizen of
22  California.

23      23.    Defendant Kent Kresa ("Kresa") has served as a director since June
24  2004. Upon information and belief, Kresa is a citizen of California.

25      24.    Defendant David H. MacCallum ("MacCallum") has been a director
26  since June 2004. He is a member of the Audit Committee. Upon information
27  and belief, MacCallum is a citizen of New York.

28

<center>5</center>

First Amended Verified Consolidated        Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

25.   Defendant Henry L. Nordhoff ("Nordhoff") has been a director since March 2005. He is a member of the Audit Committee. Upon information and belief, Nordhoff is a citizen of California.

26.   Defendant James S. Shannon ("Shannon") has been a director since February 2010. Upon information and belief, Shannon is a citizen of Pennsylvania.

27.   Mann, Edstrom, Cohen, Consiglio, Friedman, Kresa, MacCallum, Nordhoff, and Shannon are sometimes referred to herein as the "Director Defendants."

28.   Mann, Edstrom, Pfeffer, and Richardson are sometimes referred to herein as the "Officer Defendants."

29.   Consiglio, MacCallum, and Nordhoff are sometimes referred to herein as the "Audit Committee Defendants."

30.   The Director Defendants, the Officer Defendants, and the Audit Committee Defendants are sometimes referred to as the "Individual Defendants."

31.   The true names and capacities of Defendants sued herein as Does 1 through 10, inclusive, are presently not known to Plaintiff, who therefore sues these Defendants by such fictitious names. Plaintiff will seek to amend this Complaint to include these Doe Defendants' true names and capacities when they are ascertained. Each of the fictitiously named Defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by MannKind as a result of Defendants' wanton and illegal conduct.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   AFREZZA Is MannKind's Sole Core Product

32.   MannKind is a biopharmaceutical company focused on the discovery, development and commercialization of therapeutic products for diseases, such as diabetes and cancer. The Company's stock traded largely on

6

First Amended Verified Consolidated          Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

the prospects of its lead product candidate, AFREZZA (insulin human [rDNA origin]) Inhalation Powder for the treatment of adult patients with Type 1 and Type 2 diabetes for the control of hyperglycemia, a rapid-acting insulin that had completed clinical trials for the treatment of diabetes in the United States, Europe, and Japan. AFREZZA utilizes Technosphere formulation technology, which is based on a class of organic molecules that are designed to self-assemble into small particles onto which drug molecules can be loaded. With AFREZZA, the Company loads recombinant human insulin onto the Technosphere particles.

33. By the Company's own admission, MannKind will either live or die by the success or failure of AFREZZA, the one product on which MannKind has devoted well over 90% of its research and development capacity and operating expenses. As the Company has stated in numerous public filings with the SEC, MannKind does "not expect to record sales of any product prior to regulatory approval and commercialization of AFREZZA." As a result, failure to receive FDA approval for AFREZZA will cast "substantial doubt [on] our ability to continue as a going concern."

34. Further evidencing the paramount importance of AFREZZA to MannKind, the Company listed in public filings the "substantial expenditures" it has made and plans to continue to make that will cause "significant additional operating losses for at least the next several years." Nearly all of these expenditures are directly related to AFREZZA, including:

- Continuing the clinical development of AFREZZA for the treatment of diabetes;
- Seeking regulatory approval to sell AFREZZA in the United States and other markets; and
- Seeking sales and marketing collaborations for AFREZZA.

7

1    35.    Perhaps most telling, MannKind's public filings state that, "[f]or

2    2010, there were two corporate objectives, as follows:

3         • Sign a partnership agreement for AFREZZA; and

4         • Receive approval of . . . AFREZZA."

5    36.    In short, by the Company's own admission, AFREZZA is the sole

6    core product driving MannKind's operations.  Indeed, the Company exists to do

7    little else at all but develop receive approval of, and market AFREZZA.  As

8    demonstrated below, this singular focus of the Company has caused the

9    Company to spend $1.7 billion developing and testing AFREZZA without ever

10   seeing a penny in return.  Throughout this entire period, the Company has been

11   focused on one objective: receiving regulatory approval from the FDA of

12   AFREZZA.

13   37.    A prior inhaled insulin formulation, Exubera, had been approved but

14   had not been successful.  Pfizer, Inc. had invested $2.8 billion in Exubera but it

15   was not widely accepted due to the awkward nature of the inhaler.  Due to the

16   inconvenience, both doctors and patients were not enthusiastic and Pfizer

17   ultimately pulled Exubera from the market.

18   38.    The Individual Defendants knew they had to convince investors,

19   analysts, and potential partners that AFREZZA would fare better than Exubera.

20   The Individual Defendants routinely addressed the differences in more than a

21   dozen investor conference calls and presentations.  For instance, in a September

22   13, 2010 presentation at a Morgan Stanley global healthcare investor conference,

23   Mann labeled Exubera as "very inconvenient, very expensive" as compared to

24   AFREZZA.  Mann stated that comparing the two drugs was like "comparing a

25   golf cart to a luxury sedan."

26

27

28
                                        8

39.    The Individual Defendants also knew from Exubera's failure that AFREZZA could not succeed without a simple and inexpensive inhaler, so they focused substantial development efforts on inhaler design.

**B.    MannKind's Failed Attempts To Obtain Regulatory Approval**

40.    MannKind spent over $1.7 billion developing AFREZZA. Mann referred to AFREZZA as a "blockbuster" or a "super blockbuster." Although AFREZZA had some promising clinical results, it faced an extra obstacle in obtaining FDA approval. MannKind was seeking regulatory approval for a version of the combination drug product that was not used in pivotal safety or efficacy trials. All of MannKind's critical research had been conducted on an earlier version of the combination drug product that the Individual Defendants admitted was obsolete due to a redesign of the drug-delivery device. MannKind's approval efforts therefore relied upon convincing the FDA to allow it to use the clinical research for the earliest version product in support of the redesigned product it was seeking to commercialize.

41.    All of MannKind's Phase III trials, including the Phase III trials it designated as "pivotal" to show the safety and efficacy of AFREZZA, involved a first-generation version of its inhaler device known as MedTone C. MedTone C was smaller than the Exubera inhaler, but was still too large and complex for potential users. The MedTone C inhaler had numerous pieces, including a disposable mouthpiece. While the MedTone C inhaler improved usability over the Exubera inhaler, it still required patients to disassemble and clean the device weekly.

42.    Since MedTone C was not stable and was expensive to manufacture, MannKind never sought approval of AFREZZA incorporating that inhaler. Instead, MannKind's regulatory efforts initially focused on seeking FDA approval to market an incremental improvement on the first generation MedTone

9

1   C design, known as the MedTone D inhaler. Mann described MedTone C in the

2   2Q09 earnings conference call on August 3, 2009 as "a moderate change in the

3   design in order to make it more rugged and more manufacturable."

4        43.    Importantly, because its Phase III trials involved MedTone C,

5   MannKind could not use them to support approval of MedTone D AFREZZA

6   unless it also proved to the FDA that the two versions were bioequivalent.[1] In

7   the context of pill-based medicines, showing bioequivalence can be an easy

8   process.    But inhaled products, such as AFREZZA are more difficult.

9   Considerable evidence exists that different inhalers provide substantially

10  different results in the human body, even if the products appear similar in *in vitro*

11  (laboratory) tests.    In fact, MannKind scientists published an article in the

12  September 2009 edition of the Journal of Diabetes Science and Technology

13  acknowledging that different inhalers could significantly alter the performance of

14  the inhaled drug.

15       44.    A sponsor choosing to rely on bioequivalency data to establish the

16  safety or efficacy of a drug candidate bears the burden of proving to the FDA

17  that the candidate drug and the reference drug are in fact bioequivalent.    Since

18  the MedTone C and MedTone D inhalers appeared identical, the Company

19  represented that each device used the same dosage of Technosphere insulin

20  powder (30U), and the devices performed similarly in lab tests, the FDA told the

21  Individual Defendants that they needed to submit bioequivalency evidence

22  including *in vivo* clinical trials showing that the two versions of AFREZZA had

23  the same biological effect.

24

25  [1] "Bioequivalence" is a regulatory term that the FDA defines to mean "the

26  absence of a significant difference in the rate and extent to which the active
    ingredient or active moiety in pharmaceutical equivalents or pharmaceutical
    alternatives becomes available at the site of drug action when administered at the

27  same molar dose under similar conditions in an appropriately designed study."
    21 C.F.R. §320.1.

28                                          10

First Amended Verified Consolidated          Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

45.    In a January 3, 2009 press release, Richardson conceded that MannKind hoped to satisfy bioequivalence with only *in vitro* (laboratory) testing even though the FDA insisted that MannKind add an *in vivo* clinical trial comparing the absorption of each version of AFREZZA in the bodies of actual diabetes patients:

> "We were confident from bench testing that the improvements we made with the device had preserved all critical air-flow parameters, but we recognized at our pre-NDA meeting the FDA's desire to validate this fact with *in vivo* data. We collaborated with the agency in the design of [Study 138[2]]."

46.    The FDA's requirement of a meaningful *in vivo* bioequivalency study was consistent with FDA regulations, which require that applicants conduct bioequivalency testing "using the most accurate, sensitive, and reproducible approach available" and specifies that for drugs acting through systemic rather than local exposure (like insulin), *in vivo* clinical trials are generally the most accurate. 21 C.F.R. § 320.24. According to the Individual Defendants, this *in vivo* bioequivalence trial (Study 138) cleared the way for its New Drug Application ("NDA") seeking approval of MedTone D AFREZZA.

47.    On March 16, 2009, the Individual Defendants caused MannKind to issue a press release announcing that it had submitted an NDA to the FDA for approval of "AFRESA® (insulin monomer human [rDNA origin]) Inhalation Powder and the [MedTone D] AFRESA® Inhaler for the treatment of adults with type 1 or type 2 diabetes mellitus for the control of hyperglycemia."    The

---

[2] "Study 138" was a randomized, double-blind study of 75 adult diabetes patients.

11

First Amended Verified Consolidated          Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

Company's March 2009 NDA was based on a clinical program involving 44 completed studies and five ongoing studies upon its submission to the FDA. The release stated in part:

> "We are delighted to have reached this important milestone," said Alfred Mann, Chairman and Chief Executive Officer of MannKind Corporation. "This NDA submission is the culmination of years of clinical research that has supported our long-held belief that AFRESA will be a first-in-class ultra rapid-acting insulin with the potential to change the way diabetes is treated."

48.    Nearly one year later, around March 12, 2010, the FDA sent MannKind a Complete Response Letter ("CRL") refusing to approve the MedTone D version of AFREZZA on the basis of MannKind's March 2009 NDA. The Individual Defendants have kept the March 12, 2010 CRL secret and have refused to disclose to shareholders the FDA's full description of the shortcomings causing the rejection of its 2009 NDA.

49.    In limited public disclosures about the March 2010 CRL, however, the Individual Defendants conceded that the FDA had concerns about bioequivalence between MedTone C AFREZZA and MedTone D AFREZZA because MannKind chose to analyze the blood assays in the *in vivo* bioequivalency standard using a method the FDA believed to be inferior. Mann assured shareholders in the March 16, 2010 AFREZZA Update Conference Call that the assay deficiency would be "addressed in the bioequivalency study for our next generation inhaler commonly known as Dreamboat." Thus, MannKind was abandoning both versions of MedTone in favor of the Dreamboat, a second-generation inhaler that the Company said promised significant cost savings, was

12

1   smaller, disposable, and easier to use. Significantly, Dreamboat also delivered

2   powderized drug molecules more efficiently deep into the patient's lungs, and

3   thus required 1/3 less insulin powder. For that reason, Dreamboat AFREZZA

4   combined the second-generation inhaler with a 20U dose of Technosphere

5   insulin powder (instead of the 30U used in both MedTone versions).

6       50.    Mann then assured shareholders that MannKind was on track to

7   launch Dreamboat AFREZZA in 2011, and that the March 2010 CRL would not

8   delay those plans. He explained that MannKind would meet that target by

9   shifting to an entirely different regulatory approach. For the past two years,

10   MannKind had planned on first obtaining approval for MedTone D AFREZZA,

11   and with that version listed as an approved drug product, seeking a post-approval

12   change permitting it to also market Dreamboat AFREZZA.

13      51.    After the FDA rejected the 2009 NDA for MedTone D AFREZZA,

14   the Individual Defendants chose to abandon MedTone D. As Mann first told

15   investors on the March 16, 2010 conference call, MannKind would ask the FDA

16   to approve Dreamboat AFREZZA rather than MedTone D AFREZZA when

17   MannKind resubmitted its NDA in June or July 2010. But this was a drastic

18   change that would inevitably invite more regulatory scrutiny from the FDA.

19      52.    The Individual Defendants, however, assured shareholders that their

20   midstream switch in inhalers would not risk further delays, and would actually

21   help the FDA. In the March 16, 2010 investor call, the Individual Defendants

22   stated:

23
24          (Hakan Edstrom): [W]e don't really see a difference in the
25          risk assumptions in between these two approaches.

26          (Alfred E. Mann): Yeah.  Both of these approaches are
27          available to us …. I don't think that they [the FDA] have any

28                                      13

objection. They would probably find it to an advantage to go directly to Dreamboat. It would simplify their effort and shorten their obligations and would end up with a better product that will serve the patients better.

53.   The problem with this new approach was that Dreamboat had a completely different architecture, efficiency, and functionality than the MedTone devices. These differences made proving bioequivalence more difficult.

54.   In fact, the Individual Defendants acknowledged that Dreamboat was significantly different from the MedTone inhalers in several important respects:

- Dreamboat was much smaller than the MedTone inhalers. The MedTone inhalers were palm-sized, where Dreamboat was about the size of a whistle.

- Dreamboat was much less complex than the MedTone inhalers, comprised of only four parts.

- Dreamboat did not require disassembly or cleaning, while the MedTone inhalers required patients to disassemble and clean the unit every week.

- Dreamboat was less expensive to manufacture and could be discarded after two weeks use.

- Dreamboat was more efficient at delivering the insulin. More of the powder was disagglomerated[3] into small particles and delivered effectively. As a result, Dreamboat required only 2/3 the insulin powder as the MedTone versions.

---

[3] Disagglomeration refers to the transformation of the large powder particles contained in the cartridge of a dry powder inhaler to particles sufficiently fine and dispersed that they can be efficiently absorbed in the lungs.

14

First Amended Verified Consolidated Derivative Complaint

Case No. 11-cv-05003-GAF-SSx

- Dreamboat was easier for patients to operate and required less effort. Patients could inhale the full dose of insulin powder in a single breath with Dreamboat versus two breaths with the MedTone versions.

55. In light of their unconventional regulatory substitution and the difference between the inhaler designs, the Individual Defendants were well aware of their need to reach an agreement with the FDA on how, if at all, they could establish bioequivalence between Dreamboat AFREZZA and MedTone C AFREZZA.[4] On the March 16, 2011 investor call, Mann conceded that "we need to further discuss this approach with the FDA and confirm that we are aligned on what they would like to see and how they would like us to address the bridging between the inhaler that is ultimately launched and the inhaler that was used in the pivotal trials." Richardson also stated that the Individual Defendants were "aching" to meet with the FDA, explaining:

> I think that the point is that *we do need to have a face-to-face*
> *meeting with the agency ... to discuss the clinical utility and*
> *the specifics around the bioequivalence and this prospect of*
> *us now being able to submit really the substantive data that*
> *we collected around the Dreamboat device,* which is very
> important in terms for the agency looking at saying how can –
> we can continue this review and I think the choice to be able
> to submit the, what would have been an sNDA in terms of
> answer these questions is an opportunity that *we just need to*

[4] Notably, the Individual Defendants never sought approval of MedTone C AFREZZA with the FDA and abandoned unsuccessful efforts to obtain approval for MedTone D AFREZZA. Consequently, the FDA was confronted with an ever-changing series of devices to deliver a drug that had only been tested on one device, and that device had never been found by the FDA to be safe and efficacious.

15

*have that face-to-face discussion with the agency to make*
*sure we're completely aligned on.*

(Emphasis added).

56.   The Individual Defendants knew that they needed an express agreement from the FDA about any efforts to show bioequivalence for Dreamboat, but the Individual Defendants never obtained an agreement. Rather, the Individual Defendants designed, enrolled test subjects, and conducted the bulk of their only human comparative study involving Dreamboat (Study 142) before even meeting with the FDA.

57.   The Individual Defendants had no reasonable basis to tell shareholders that the FDA had agreed to treat Study 142 as evidence of bioequivalence.  The Individual Defendants knew this to be an open question as of March 16, 2010, but did not raise it with the FDA until June 9, 2010, when Study 142 was largely complete except for blood assays and data analysis.

58.   It is important to note that each Individual Defendant, including each Director Defendant, knew that MannKind had not met with the FDA prior to commencement of Study 142, and consequently, that MannKind had not received "pre-approval" of Study 142's methodology.  As reflected in the Company's August 2, 2010, Form 10-Q filed with the SEC and reviewed by each Director Defendant, MannKind had a series of communications with the FDA throughout 2010 and 2011.  The Director Defendants not only knew about each of these communications, but also knew about the content of these communications, as reflected in the summaries provided in MannKind's public filings.  These communications included:

- The FDA's March 2010 CRL rejecting MannKind's 2009 NDA of AFREZZA, and thus delaying approval of Dreamboat;

16

First Amended Verified Consolidated
Derivative Complaint

Case No. 11-cv-05003-GAF-SSx

- The June 9, 2010, end-of-review meeting with the FDA to discuss the by-then largely complete Study 142; and

- The January 18, 2011, CRL rejecting MannKind's 2010 NDA of AFREZZA, and thus delaying approval of Dreamboat.

59.     Despite   offering   detailed   summaries   of   each   of   these communications, MannKind's public filings – as prepared and submitted by the Individual Defendants and reviewed by the Director Defendants – say nothing about any discussion in any of these communications about receiving or even attempting to receive "pre-approval" from the FDA of Study 142's methodology. In fact, such "pre-approval" would have been impossible to receive during these communications, because MannKind did not even know it would have to commence Study 142 until it received the March 2010 CRL from the FDA, and MannKind did not meet with the FDA again until June 9, 2010, when Study 142 was already largely complete.  Therefore, based on MannKind's own detailed public statements about the Company's communications with the FDA, the paramount importance of receiving regulatory approval of AFREZZA from the FDA, and the Director Defendants obligations concerning oversight of MannKind's operations and review of public filings, it is clear that the Director Defendants either knew or were reckless in not knowing that the Company had not received "pre-approval" of Study 142 from the FDA.

60.     The Individual Defendants also did not have a reasonable basis to conclude or assert that the FDA agreed at the June 9, 2010 end-of-review ("EOR") meeting – an official meeting intended to discuss the FDA's review resulting in the March 2010 CRL – to consider Study 142 to be proof of bioequivalence.  Although the FDA's meeting minutes are the official record of any agreements reached in the meeting, Edstrom confirmed in the Q3 2010 investor conference call that the Company did not receive minutes from that

17

First Amended Verified Consolidated   Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

1    meeting. Since the Company did not have the official record of the discussions

2    and agreements reached during the meeting with the FDA, the Individual

3    Defendants lacked any reasonable basis to state an agreement had been reached.

4        61.    Further, Study 142 was flawed because it was performed on healthy

5    individuals and not diabetic patients. Thus, the effect of the amount of insulin

6    delivered via the inhaler could be entirely different on diabetic patients versus

7    normal subjects. As the FDA noted, Study 142 was just a "pharmacology grid,"

8    which was not designed to provide the pharmacokinetic data in diabetic patients

9    necessary to show bioequivalency between Dreamboat and MedTone C. The

10   Individual Defendants had no legitimate reason to expect that the FDA would or

11   could accept Study 142 as sufficient evidence of bioequivalence.

12       62.    Instead, the "pharmacology grid" from Study 142 shows that the

13   two inhaler designs do not meet the legal requirements for finding

14   bioequivalence. Bioequivalence requires that the same molar dose of two drug

15   products deliver essentially the same amount of the active ingredient into the site

16   of action. 21 C.F.R. § 320.1. Study 142, however, did not show that the same

17   molar doses of Dreamboat AFREZZA and MedTone C AFREZZA delivered the

18   same amount of insulin into the bloodstream. Rather, Study 142 showed that

19   20U of Dreamboat AFREZZA delivered the same amount of insulin into the

20   bloodstream as 30U of MedTone C AFREZZA. In other words, MedTone C

21   AFREZZA required a 50% larger does. Thus, as a matter of law, 20U of

22   Dreamboat AFREZZA cannot be deemed bioequivalent to the 30U of MedTone

23   C AFREZZA.

24       63.    The Individual Defendants also knew Dreamboat AFREZZA and

25   MedTone C AFREZZA would not qualify as bioequivalent for other reasons.

26   The FDA Commissioner is instructed to consider as evidence that two drug

27   products are not or may not be bioequivalent drug products "[p]hysicochemical

28

18

First Amended Verified Consolidated      Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

evidence that ... [t]he particle size and/or surface area of the active drug ingredient is critical in determining its bioavailability." 21 C.F.R. §320.33(e)(3).

64.    MannKind's 2010 brochure entitled "Innovation in Drug Delivery by Inhalation" concedes that particle size is critical in determining the bioavailability of AFREZZA:

> Successful delivery of dry-powder formulations requires careful consideration of many factors.    Human anatomy dictates that particles with aerodynamic diameters of 1-10μm have the highest probability of reaching and depositing in the deep lung.    Larger particles may be filtered by the tortuous path from mouth to alveoli and smaller ones many not settle or impact and can be exhaled.

The same brochure details that Dreamboat was extensively tested and redesigned to optimize particle size characteristics.    And in a June 9, 2010 Needham & Co. investor conference, Pfeffer expressed that Dreamboat AFREZZA was the "ideal size for inhalation, which is roughly six microns or less."    Thus, the Individual Defendants were aware that dosing variations and reliance on small particle size rendered Dreamboat AFREZZA and MedTone C AFREZZA too different to qualify as bioequivalent under FDA regulations.

**C.    The Individual Defendants Were Motivated To Artificially Inflate The Company's Stock Price Above $6.50 Per Share**

65.    As stated in the Company's August 2, 2010, Form 10-Q, MannKind funds its operations "primarily through the sale of equity securities, convertible debt securities and borrowings under our related party loan."    MannKind also admitted its precarious financial situation, explaining that, "if we are unable to

19

First Amended Verified Consolidated Derivative Complaint

Case No. 11-cv-05003-GAF-SSx

obtain additional funding in the future, there will be substantial doubt about our ability to continue as a going concern."

This "related party loan" referred to an agreement entered into in October 2007 between the Company and majority shareholder Mann. Under the arrangement, the Company could borrow up to a total of $350 million. The terms of this loan were extremely restrictive to MannKind. For example, at any time after January 1, 2010, Mann could require the Company to prepay up to $200.0 million in advances that have been outstanding for at least 12 months. Moreover, any borrowings under the loan arrangement will be unsecured. The loan arrangement contains no financial covenants. There are no warrants associated with the loan arrangement, nor are advances convertible into the Company's common stock. Perhaps most concerning to the Company throughout 2010 and early 2011 when Defendants were making their misleading statements about AFREZZA was the fact that principal repayment of the $350 million was due by December 31, 2011. Defendants knew that repayment of this loan would be impossible by then without either a) approval of AFREZZA by the FDA, or b) securing significant additional financing.

66.    As of December 31, 2010, the outstanding debt MannKind owed Mann was $235.5 million. Because of the high capital requirements to receive regulatory approval by the FDA, and the repayment obligations hanging over the Company from the October 2007 loan agreement, the Company was constantly seeking out additional financing. Mann and the Individual Defendants, however, did not want to exhaust the available loan financing under Mann's loan arrangement, so the Individual Defendants sought outside financing.

67.    On August 10, 2010, the Company entered into a common stock purchase agreement with Seaside 88, LP ("Seaside"). The Seaside purchase agreement required the Company to issue and sell, and Seaside to buy, up to

20

1   18,200,000 shares of MannKind common stock in installments of 700,000 shares
2   once every 14 days, subject to certain conditions. Notably, the ten-day volume
3   weighted average trading price for a particular closing must be above $6.50 per
4   share for Seaside to purchase any shares. The agreement had the potential to
5   bring in over $100 million in financing for the Company but only if MannKind
6   was able to keep its shares propped above $6.50.

7       68.    In conjunction with the Seaside Agreement in August 2010, the
8   Company entered into a new agreement with Mann that would convert a portion
9   of the massive debt the Company owed him into an equal amount of MannKind
10  shares. Under the agreement, Mann is obligated to acquire the same number of
11  shares of the Company's stock that Seaside purchases on each closing date under
12  the Seaside agreement.    Thus, the new deal with Mann could improve
13  MannKind's capital position by more than $100 million but only if MannKind
14  was able to keep its shares propped above $6.50.

15      69.    Several analysts commented on the deal, including its potential to
16  enhance MannKind's bargaining position with prospective partners. A Wells
17  Fargo analyst noted:

18          *We think the agreement could fund operations beyond year-*
19          *end 2011.*   On the Q2 2010 earnings call, management
20          indicated that cash/borrowing resources would fund
21          operations through Q1 2011. Based on MNKD's August 10
22          close, *the Seaside agreement would provide MNKD about*
23          *$30MM per quarter through late Q3 2011.*   Assuming the
24          Q2 cash burn of $38MM per quarter and MNKD's $31MM
25          cash and $108MM in available borrowings at the end of Q2,
26          share sales would fund operations through Q4 2011; share
27          price appreciation would extend that ... *Deal provides*

                                    21

*improved bargaining position with potential partners, in our
view.* We think the agreement will offer MNKD more time to
select a partner and will prevent MNKD from having to
accept poor terms.

(Emphasis added)

70.    An Oppenheimer analyst also noted that maintaining a high share
price was the key to accessing cash under the terms of the Seaside deal: "We
noted that MNKD cannot access additional cash under this agreement if the
shares fell significantly below $6.50."

### D.    The Individual Defendants Mislead Investors About The Dreamboat Approval Process

71.    As stated in MannKind's August 2, 2010, Form 10-Q:

We are a development stage enterprise and have incurred significant
losses since our inception in 1991. As of June 30, 2010, we have
incurred a cumulative net loss of $1.7 billion and a stockholders'
deficit of $137.7 million. To date, we have not generated any
product revenues and have funded our operations primarily through
the sale of equity securities, convertible debt securities and
borrowings under our related party loan. As discussed below in
"Liquidity and Capital Resources," if we are unable to obtain
additional funding in the future, there will be substantial doubt
about our ability to continue as a going concern.

72.    In other words, the Company relies primarily on outside investors to
keep the doors open while MannKind attempts to receive regulatory approval
from AFREZZA. As a result, the Individual Defendants routinely participate in

22

healthcare investors' conferences in which the Individual Defendants discuss AFREZZA, its chances for FDA approval, and its chances as a commercially viable drug, in an effort to secure funding for continued operations.

73.    Participation in these conferences, and particularly the prepared remarks and presentations given at these conferences, are critically important to the Company. Indeed, the very lifeblood of the Company's financial operations – the money received from large institutional investors participating in these conferences – depends heavily on the statements made by the Individual Defendants in these conferences. For this very important reason, MannKind's website lists each healthcare conference in which the Individual Defendants are participating, the Company issues a press release for each of these conferences, and the Company either carries live audio of the conferences or links to audio recordings and/or transcripts of these conferences.

74.    Given the critical importance of these conferences, as well as the importance of the Individual Defendants' statements at these conferences, the Individual Defendants have prepared scripted remarks that largely remain the same throughout each of these conferences. As demonstrated below, the false and misleading statements about Dreamboat AFREZZA largely remain the same at each conference. Moreover, given the importance of these statements, their ubiquitous availability on MannKind's website and elsewhere, and their largely scripted nature, it is clear that the Director Defendants either review and authorize these statements in advance of any investment and marketing push such as that described below, or review and become aware of the content of these statements after they have been made. Indeed, it would be extremely reckless for the Director Defendants not to know the contents of these critically important statements.

---

23

First Amended Verified Consolidated          Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

75.     After deciding to substitute the new Dreamboat inhaler in their 2010 NDA resubmission, the Individual Defendants sought to persuade investors that MannKind would easily be able to establish bioequivalence, safety and efficacy with the new inhaler design.  In the process, the Individual Defendants neglected their regulatory efforts as they were busy in May and June 2010 courting investors.  In those two months alone, MannKind sent its top executives to at least six investor conferences.  Notably, Mann skipped the most important meeting – the June 9, 2010 EOR meeting with the FDA following the March 2010 CRL – so that he could court investors at the Jefferies & Co. investor conference.

76.     During these investor conferences, and in conference calls with investors and press releases issued for investors, the Individual Defendants either intentionally or with reckless disregard for the truth made several misrepresentations.

77.     On May 4, 2010, at a Deutsche Bank healthcare investors conference, Defendant Pfeffer stated:

> As you know, we do have a new inversion inhaler. That was the one you saw on the slide. We did recently complete the bioequivalence study. That was the so-called 142 study for the generation two device compared to the so-called Model C MedTone Inhaler, which is what we used in the Phase III pivotals. The study recently wrapped up and we did show bioequivalence. It's important to note that the study's design here was vetted with the FDA in advance. We got the blessing on the design last November for a fairly straightforward bioequivalence study.

24

Defendant Pfeffer promised that all bioequivalency work had been completed, and claimed that investors who were concerned about bioequivalence were just "confused":

> By clinical work, what we're talking about essentially is the bioequivalence study. Now, people seem confused by that sometimes, so I guess I should elaborate on that because typically if you have a lung delivered product, it's difficult to do bioequivalency studies. That's because most of those products are topical lung products. In this instance, this is something we can do just with a simple blood test. So a bioequivalency study makes a lot more sense. You have to do a fair amount of handling studies and so forth, but it's all been completed at this point.

78.    Defendant Pfeffer's statements were materially false and/or misleading when made because he knew that:

(a)    Study 142 was not a "bioequivalency study" and did not "show bioequivalence." As the FDA made clear in the January 2011 CRL, Study 142 was just a "pharmacology grid" in healthy (non-diabetic) patients. Because study 142 was performed only on normal healthy adults, it was not designed to and could not possibly demonstrate that diabetes patients who inhaled Dreamboat AFREZZA experienced the same pharmacokinetic effects as patients that inhaled MedTone C AFREZZA.

(b)    Study 142 was not "vetted" or "bless[ed] by the FDA" as a means of establishing bioequivalence, as confirmed by the fact that the FDA determined Study 142 was inadequate to establish bioequivalence

25

even in combination with *in vitro* data, and by the fact that the FDA characterized MannKind's use of Study 142 as an attempt to rely on inadequate data.

(c)   Study 142 demonstrated that Dreamboat AFREZZA and MedTone C AFREZZA required different doses to achieve the same pharmacokinetic effect, making it impossible for MannKind to satisfy the regulatory standard for demonstrating bioequivalence.

(d)   MannKind had no *in vitro* clinical data showing that diabetes patients who inhaled Dreamboat AFREZZA experienced the same pharmacokinetic effects as MedTone C AFREZZA, and thus could not meet the *in vitro* study requirements for showing bioequivalence that the FDA had made clear would be necessary at least as early as the pre-NDA meeting.

(e)   Statements regarding a November 2009 discussion with the FDA about Dreamboat were materially misleading because those discussions focused on MannKind's then-stated strategy to seek a post-approval change addressing Dreamboat after first obtaining approval for MedTone D AFREZZA.   The discussion did not address obtaining approval in the first instance for a drug/device combination not used in any pivotal trial. Further, those conversations occurred before the Dreamboat inhaler had been finalized and before the Dreamboat inhaler was determined to require a smaller therapeutic dosage, making it impossible to establish bioequivalence under FDA regulations.

(f)   All bioequivalency work that MannKind needed to complete had not been completed at the time of the statements, and still has not been completed.

First Amended Verified Consolidated          Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

(g)   Statements suggesting that establishing bioequivalence between the different inhalers here was less difficult than in other products are materially misleading because MannKind's efforts were insufficient and Pfeffer had no reasonable basis to suggest that investors' concerns were unwarranted. As the January 2011 CRL confirms, establishing bioequivalence is far more difficult than Pfeffer stated.

79.   On May 12, 2010, at a Bank of America healthcare investors conference, Defendant Mann stated:

> In getting the new inhaler approved, they [the FDA] already approved the protocol for it, and we have completed all the elements of the protocol and that will be submitted along with this. The 142 showed very good bioequivalency, not an issue at all.

In the Q & A session, Mann reiterated that MannKind had completed all the work necessary to bridge the pivotal MedTone C trials to the new Dreamboat device:

> <Q>: Thanks very much. Just so I understand where you are with the FDA, you mentioned that they don't require any new clinical studies? Do you have a sense with them on the new device whether they could come back and request new clinical trials specifically with the new device or did you already have discussions previously when you did your bioequivalency studies?
>
> <A>: Alfred E. Mann, Chairman and Chief Executive Officer>: Well, what we did is about a year ago, we went to

27

them and said we've made such progress in this new device
that we would like to bridge to this device. And we would
like to have a meeting with you to discuss how to get there?
And they said, send us a briefing book and a proposed
protocol and we'll come back to you, in writing. And so they
came back to us finally and we started this thing. There were
four elements to the protocol, they've all been completed,
although because of the question they raised about the insulin
assay methodology, we are doing it both ways and doing it
their way, still another couple of weeks to go. But it will be
done in time to submit it easily with our response to the CRL.

80.    Defendant Mann's statements were materially false and/or
misleading when made because he knew that:

(a)    Study 142 was not a "bioequivalency study" and did not "show[]
very good bioequivalency." As the FDA made clear in the January
2011 CRL, Study 142 was just a "pharmacology grid" in healthy
(non-diabetic) patients. Because study 142 was performed only on
normal healthy adults, it was not designed to and could not possibly
demonstrate that diabetes patients who inhaled Dreamboat
AFREZZA experienced the same pharmacokinetic effects as
patients that inhaled MedTone C AFREZZA.

(b)    The FDA had not approved the protocol that MannKind employed
in Study 142 as a means of establishing bioequivalence, as
confirmed by the fact that the FDA determined that Study 142 was
inadequate to establish bioequivalence even in combination with *in
vitro* data, and by the fact that the FDA characterized MannKind's
use of Study 142 as an attempt to rely on inadequate data.

28

(c)  Study 142 demonstrated that Dreamboat AFREZZA and MedTone C AFREZZA required different doses to achieve the same pharmacokinetic effect, making it impossible for MannKind to satisfy the regulatory standard for demonstrating bioequivalence.

(d)  MannKind had no *in vitro* clinical data showing that diabetes patients who inhaled Dreamboat AFREZZA experienced the same pharmacokinetic effects as MedTone C AFREZZA, and thus could not meet the *in vitro* study requirements for showing bioequivalence that the FDA had made clear would be necessary at least as early as the pre-NDA meeting.

(e)  Statements regarding prior year discussion with the FDA about Dreamboat were misleading because those discussions focused on MannKind's then-stated strategy to seek a post-approval change addressing Dreamboat after first obtaining approval for MedTone D AFREZZA. The discussion did not address obtaining approval in the first instance for a drug/device combination not used in any pivotal trial. Further, those conversations occurred before the Dreamboat inhaler had been finalized and before the Dreamboat inhaler was determined to require a smaller therapeutic dosage, making it impossible to establish bioequivalence under FDA regulations.

(f)  All bioequivalency work that MannKind needed to complete had not been completed at the time of the statements, and still has not been completed.

(g)  In light of MannKind's failure to prove bioequivalence with the MedTone C AFREZZA used in clinical trials, the FDA would be required by law to demand clinical trials demonstrating the safety

29

1     and efficacy of the Dreamboat AFREZZA that MannKind intended
2     to substitute into the resubmitted NDA.

3     81.    On May 17, 2010, at a Rodman & Renshaw healthcare investors
4 conference, Defendant Mann stated that the "[b]ioequivalency study for the new
5 device has been completed and everything is done and it shows very good
6 statistics for the new device compared to the one we did and they currently used
7 in the clinical trials."

8     82.    Defendant Mann's statements were materially false and/or
9 misleading when made because he knew that:

10       (a)    Bioequivalency studies for the new Dreamboat inhaler had not been
11             completed.

12       (b)    MannKind did not have and could not have "very good statistics" to
13             compare the new Dreamboat device to the MedTone C device used
14             in clinical trials. In fact, it had no in vitro trials comparing whether
15             diabetes patients experienced the same pharmacokinetic effects
16             using Dreamboat AFREZZA as they did using MedTone C
17             AFREZZA.

18       (c)    The only comparative clinical study for Dreamboat, Study 142, was
19             just a "pharmacology grid" which only measured absorption of the
20             drug in healthy (non-diabetic) patients and was incapable of
21             establishing bioequivalence.

22       (d)    Study 142 demonstrated that Dreamboat AFREZZA and MedTone
23             C AFREZZA required different doses to achieve the same
24             pharmacokinetic effect, making it impossible for MannKind to
25             satisfy the regulatory standard for demonstrating bioequivalence.

26     83.    At a June 9, 2010 healthcare investors conference sponsored by
27 Jefferies & Co. (Defendant Mann attended this conference instead of the FDA

28

30

1   meeting scheduled for that same day), Mann stated that "we've certainly

2   demonstrated safety and efficacy" of AFREZZA.   But this statement was

3   materially false and/or misleading when made because MannKind had not

4   established safety and efficacy of the version of AFREZZA which it intended to

5   commercialize (*i.e.*, with the Dreamboat inhaler), and had not established

6   bioequivalence between Dreamboat AFREZZA and the MedTone C version of

7   AFREZZA used in all pivotal safety and efficacy clinical trials.

8         84.     That same day, Defendant Pfeffer appeared at the Needham &

9   Company Healthcare Conference and stated:

> Overall safety, I think this is becoming less of a story as time
> goes on and as people start to understand the product and it
> doesn't have some of the issues that were hypothecated for a
> predecessor product, but it has been very extensively studied,
> we don't have safety issues.
>
> ****
>
> *We did complete our bioequivalence study* of the new inhaler
> that we talked about versus the old one, and *that was
> successful, we did show bioequivalence in that study. It was
> designed based on   FDA recommendations* and that was a
> relief to some people.

(Emphasis added).

23        85.     Defendant Pfeffer's statements were materially false and/or

24   misleading when made because he knew:

25        (a)     MannKind had no safety data that could support its resubmitted

26                NDA for Dreamboat AFREZZA. In fact, it was only on June 24,

27                2011, that MannKind first announced the results of two studies that

31

found no increased risk of cardiac events in Type 1 or Type 2 diabetes patients treated with Dreamboat AFREZZA.

(b)   The study referenced – Study 142 – was not a "bioequivalence study," was not "successful," and did not "show bioequivalence." As the FDA made clear in the January 2011 CRL, Study 142 was just a "pharmacology grid" in healthy (non-diabetic) patients. Because Study 142 was performed only on normal healthy adults, it was not designed to and could not possibly demonstrate that diabetes patients who inhaled Dreamboat AFREZZA experienced the same pharmacokinetic effects as patients that inhaled MedTone C AFREZZA.

(c)   Study 142 was not "designed based on FDA recommendations," as confirmed by the fact that the FDA determined that Study 142 was inadequate to establish bioequivalency even in combination with *in vitro* data, and by the fact that the FDA characterized MannKind's use of Study 142 as an attempt to rely on inadequate data.

(d)   Study 142 demonstrated that Dreamboat AFREZZA and MedTone C AFREZZA required different doses to achieve the same pharmacokinetic effect, making it impossible for MannKind to satisfy the regulatory standard for demonstrating bioequivalence.

(e)   All bioequivalency work that MannKind needed to complete had not been completed at the time of the statements, and still has not been completed.

(f)   Both Mann and Pfeffer did not attend the EOR meeting with the FDA *that very day*, wherein both the reasons for the CRL and the steps MannKind needed to take to obtain FDA approval were discussed. Thus, neither had any reasonable basis for commenting

32

that safety and bioequivalence had been adequately addressed to the FDA's specifications.

86.    During the Wells Fargo Securities Healthcare Conference on June 24, 2010, Defendants Richardson and Mann stated the following:

[RICHARDSON:] But in terms of where we are with the response to the Complete Response letter, there were three areas which I think we've shared very clearly in terms of that. One was the question of clinical utility, and we all had a question in terms of exactly what was meant by clinical utility. I think when we substitute that, indeed I talked in terms of some other unusual phase to the use in terms of – especially when discussing something such as insulin, we know it's got established efficacy. We know that we have demonstrated in two placebo-controlled studies that we have differentiation from that. *So the question of efficacy really isn't there.*

****

[ANALYST:] And I take it from – given the fact that you hadn't really put out a separate press release about the FDA meeting that studies or anything out of the extraordinary that came out of that meeting?

[MANN:] *The meeting was very – seemed to be very supportive.* I wasn't there, but the reports from our team – Peter should really answer this, he was at the meeting, but it was a very good meeting.        Peter?

33

First Amended Verified Consolidated
Derivative Complaint

Case No. 11-cv-05003-GAF-SSx

[RICHARDSON:] Yeah, I think, I'm the only person in the room that was present at the meeting. *And I would describe it as a very productive meeting.*

(Emphasis added).

87.    Defendants Mann and Richardson's statements were materially false and/or misleading when made because they knew:

(a)    Efficacy remained a question because MannKind lacked any Phase III efficacy data that could legally support its NDA resubmission for Dreamboat AFREZZA.

(b)    MannKind lacked sufficient evidence of bioequivalence such that the two "placebo-controlled" studies Richardson referenced, which involved the MedTone C inhaler, could be used to support Dreamboat AFREZZA.

(c)    In the end-of-review meeting Richardson and Mann discussed, the FDA did not support MannKind's efforts to rely on "inadequate" *in vitro* studies and a pharmacological grid instead of real bioequivalency studies in diabetes patients, or give MannKind any reason to believe that it would (or could) approve Dreamboat AFREZZA as it was to be resubmitted without either separate pivotal clinical trials using the to-be-commercialized Dreamboat inhaler, or full bioequivalence evidence bridging that inhaler to the MedTone C inhaler used in pivotal clinical trials.

88.    On July 20, 2010, the Individual Defendants caused MannKind to issue a press release announcing that the FDA had "accepted"[5] the Company's resubmission of its NDA for AFREZZA. Defendant Mann is quoted in the press

[5] The proper term is either "accepted for filing" or "accepted for review." It is unclear why MannKind omitted those qualifiers.

34

1    release as stating: "We have worked diligently since March to prepare our
2    resubmission and we are confident that we have addressed the requests that were
3    outlined by the FDA."

4        89.    Defendant Mann's statements were materially false and/or
5    misleading when made because he knew:

6        (a)    MannKind had not addressed the requests that were outlined by the
7            FDA. In particular it chose not include meaningful evidence of
8            bioequivalence in its resubmitted NDA. Instead, it attempted to rely
9            on "inadequate" *in vitro* data and a pharmacology grid in healthy
10           patients that could not possibly establish that diabetes patients
11           inhaling insulin using the Dreamboat device experienced equivalent
12           pharmacokinetic effects as diabetes patients inhaling insulin using
13           the MedTone C device.

14       (b)    The comparative data submitted in the 2010 NDA resubmission
15           established that bioequivalence could not be established as a matter
16           of law and that the FDA's questions regarding bioequivalence
17           therefore could not be satisfied.

18       90.    On August 2, 2010, MannKind held its second quarter 2010
19   earnings conference call. On that call, Defendant Richardson stated the
20   following:

21           Because there has been considerable interest in
22           bioequivalence, I will go over in some detail results of these
23           studies, showing that *we've met the FDA established*
24           *definition using two well validated assays as agreed with the*
25           *Agency. Study 142 has demonstrated the inhalation system*
26           *used in the Phase 3 trials and generation 2 inhalation*
27           *system to be bioequivalent.* Bioequivalence is key to linking

35

1  the pivotal clinical data from the MedTone inhalation system
2  to the to-be- marketed generation 2 inhalation system.

3  ****

4  AFREZZA compromises regular human insulin, absorbed on
5  to carrier particles composed of fumaryl diketopiperazine:
6  FDKP.   Bioequivalence of the two inhalation system
7  measuring insulin levels ensures that the efficacy will be the
8  same, while equivalent exposure measuring the excipient
9  FDKP ensures that the fine particle exposure to the lung is the
10  same, therefore showing is key to linking the efficacy data
11  and furthermore demonstrating bioequivalence in insulin and
12  equivalent FDKP exposure combined is key to linking
13  pulmonary safety data from the extensive MedTone C Phase
14  3 program to data collected from the studies using the to be
15  marketed generation 2 inhalation system.

16
17  In summary, as this inhalation system is designed for the
18  delivery of the systematically active drug, our development
19  approach for the generation 2 inhalation system has been to
20  match all performance characteristics that could affect
21  systematic exposure. As we can reliably assess the
22  systematically active levels in insulin and the [inaudible]
23  FDKP in the circulation, we've been able to develop a
24  product that is bioequivalent to the one we used in all of our
25  Phase 3 clinical studies.

26  (Emphasis added).
27
28

36

91.     Defendant Richardson's statements were materially false and/or misleading when made because he knew:

(a)     Study142 was not a "bioequivalence study" and did not "show bioequivalence" or establish that Dreamboat AFREZZA is "bioequivalent to the one [MedTone C AFREZZA]… used in all of our Phase 3 clinical studies." As the FDA made clear in the January 2011 CRL, Study 142 was just a "pharmacology grid" in healthy (non-diabetic) patients. Because Study 142 was performed only on normal healthy adults, it was not designed to and could not possibly demonstrate that diabetes patients who inhaled Dreamboat AFREZZA experienced the same pharmacokinetic effects as patients that inhaled MedTone C AFREZZA.

(b)     Study 142 demonstrated that Dreamboat AFREZZA and MedTone C AFREZZA required different doses to achieve the same pharmacokinetic effect, making it impossible for MannKind to satisfy the regulatory standard for demonstrating bioequivalence.

(c)     Neither Study 142 nor any other data provided in MannKind's NDA resubmission was capable of "linking the pivotal clinical data from the MedTone inhalation system to the to-be-marketed generation 2 inhalation system."

(d)     MannKind had no *in vivo* clinical data showing that diabetes patients who inhaled Dreamboat AFREZZA experienced the same pharmacokinetic effects as MedTone C AFREZZA, and thus could not meet the *in vivo* study requirements for showing bioequivalence that the FDA had made clear would be necessary at least as early as the pre-NDA meeting. As indicated above, the fact that MannKind performed such tests with respect to its initial efforts to prove

37

First Amended Verified Consolidated
Derivative Complaint

Case No. 11-cv-05003-GAF-SSx

MedTone D AFREZZA the bioequivalent of MedTone C
AFREZZA demonstrates that Defendants knew such tests were
necessary.

92.    On August 11, 2010, at a Cannacord Adams growth investors
conference, Defendant Pfeffer stated:

> We did receive a complete response letter earlier in the year,
> but managed to get back on file fairly quickly because we
> found the issues they raised relatively easily addressable by
> us.
>
> ****
>
> We did – we were able to announce the results, and you can
> see slides and detailed information about our bioequivalence
> study. *This is in keeping with an agreement we've made*
> *with the FDA for how to change from one inhaler to the*
> *next*; this is a little unusual for an inhaled product, but our
> inhaled product is different, because it's a    systematic
> treatment. It's not something that's topical into one, so it
> lends itself pretty nicely to a bioequivalence study design. We
> can show we get the same amount of powder to the lung and
> it has the same biological effect in the blood stream as our old
> inhaler, which is what we think we need to show to the FDA
> to get them to switch the new inhaler.

(Emphasis added).

93.    Defendant Pfeffer's statements were materially false and/or
misleading when made because he knew:

(a)    The referenced study included in MannKind's NDA resubmission –
Study 142 – was not a "bioequivalence study" and did not show that

38

Dreamboat produced the "same biological effect" in diabetes patients as the old inhaler. As the FDA made clear in the January 2011 CRL, Study 142 was just a "pharmacology grid" in healthy (non-diabetic) patients. Because Study 142 was performed only on normal healthy adults, it was not designed to and could not possibly demonstrate that diabetes patients who used Dreamboat AFREZZA experienced the same pharmacokinetic effects as patients who used MedTone C AFREZZA.

(b)    There was no "agreement...made with the FDA" to allow bioequivalence to be established by study 142. To the contrary, as the FDA made clear in its January 2011 CRL, it did not approve of the Company's attempt to rely on "inadequate" data.

(c)    Study 142 demonstrated that Dreamboat AFREZZA and MedTone C AFREZZA required different doses to achieve the same pharmacokinetic effect, making it impossible for MannKind to satisfy the regulatory standard for demonstrating bioequivalence.

(d)    MannKind had no *in vivo* clinical data showing that diabetes patients who used Dreamboat AFREZZA experienced the same pharmacokinetic effects as patients who used MedTone C AFREZZA, and thus could not meet the *in vivo* study requirements for showing bioequivalence that the FDA had made clear would be necessary at least as early as the pre-NDA meeting. As indicated above, the fact that MannKind performed such tests with respect to its initial efforts to prove MedTone D AFREZZA the bioequivalent of MedTone C AFREZZA demonstrates that Defendants knew such tests were necessary.

39

(e)    Statements regarding a prior "agreement" with the FDA regarding Dreamboat were materially misleading because those discussions focused on how MannKind could file a supplemental NDA for Dreamboat if it had already obtained approval for AFREZZA with MedTone, and did not address obtaining approval in the first instance for a drug/device combination not used in any pivotal trial.

(f)    MannKind could not "easily" respond to the deficiencies that the FDA had identified in its first CRL, and had not in fact satisfied those concerns.

94.    On September 13, 2010, the Individual Defendants attended the Morgan Stanley Global Healthcare Conference call for analysts, media representatives and investors, during which Mann represented that the "FDA has raised not a single safety concern related to AFREZZA." This statement was materially false and/or misleading when made because (a) the FDA had in fact made clear that it was concerned about bringing safety data from the prior inhaler to the designs to be commercialized, and MannKind had not satisfied those concerns or established bioequivalence sufficiently to bridge safety data to Dreamboat AFREZZA; and (b) MannKind did not have and could not present any pivotal safety trials applicable to Dreamboat AFREZZA.

95.    The following day, at another investor conference sponsored by Robert W. Baird & Co., Defendant Edstrom stated "We certainly believe we have demonstrated the safety and efficacy of the product." This statement was materially false and/or misleading when made because (a) MannKind had not conducted any pivotal safety or efficacy trials using the version of the product it sought to commercialize (i.e., with the Dreamboat inhaler), and certainly had not "demonstrated the safety or efficacy" of the current product version; (b) MannKind had not demonstrated, and lacked, meaningful bioequivalence data

40

1    that would permit it to use safety and efficacy data from an earlier version of the

2    combination drug product in support of its application to approve Dreamboat

3    AFREZZA; and (c) as a result of (a) and (b), above, Edstrom did not have any

4    reasonable basis to believe that MannKind had "demonstrated the safety and

5    efficacy of the product." Instead, MannKind attempted to rely on "inadequate"

6    data that could not possibly establish that Dreamboat AFREZZA was

7    bioequivalent to the MedTone C version of AFREZZA used in pivotal trials.

8        96.    The following day, on September 15, 2010, at a Rodman &

9    Renshaw healthcare investors conference, Defendant Mann rejected questions

10   regarding bioequivalency and assured investors that all FDA concerns on the

11   subject had been satisfied:

13       <Q>: Given the fact that you switched...does the FDA...

14       <A>- Alfred E. Mann, Chairman and Chief Executive

15       Officer>: *They have accepted all the bioequivalency and*

16       *handling studies  we did. They have accepted the re-*

17       *submission with the new device.*

18       <Q>: And the studies are valid-

19       <A>- Alfred E. Mann, Chairman and Chief Executive

20       Officer>: *We demonstrated that the amount of insulin going*

21       *into the lungs and to the blood are identical. They are very*

22       *comfortable with that.*

23   (Emphasis added).

24       97.    Defendant Mann's statements were materially false and/or

25   misleading when made because he knew:

26       (a)    The FDA had not accepted any of MannKind's "bioequivalency" or

27       handling studies.

28

First Amended Verified Consolidated          Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

(b)   The "bioequivalency" studies were not "valid" and did not establish
bioequivalency.  As the FDA made clear in the January 2011 CRL,
Study 142 was just a "pharmacology grid" in healthy (non-diabetic)
patients. Because Study 142 was performed only on normal healthy
adults, it was not designed to and could not possibly demonstrate
that  diabetes  patients  who  inhaled  Dreamboat  AFREZZA
experienced  the  same  pharmacokinetic  effects  as  patients  that
inhaled MedTone C AFREZZA.

(c)   Study 142 demonstrated that Dreamboat AFREZZA and MedTone
C  AFREZZA  required  different  doses  to  achieve  the  same
pharmacokinetic effect, making it impossible for MannKind to
satisfy the regulatory standard for demonstrating bioequivalence.

(d)   MannKind had not "demonstrated that the amount of insulin going
into the lungs and to the blood are identical" as between MedTone C
AFREZZA and Dreamboat AFREZZA.

(e)   The FDA was not "very comfortable" with MannKind's comparison
of "the amount of insulin going into the lungs and to the blood are
identical"  as  between  MedTone  C  AFREZZA  and  Dreamboat
AFREZZA.

98.   On September 21, 2010, Defendant Pfeffer presented at a UBS life
sciences investor conference, and stated:

> Almost a year later, in March of this year, we ultimately got a
> Complete Response letter with some relatively, we felt, easy-
> to- answer issues. We did have an End-of Review meeting
> with the FDA on June 9 to charter a path forward, and get
> their agreement on our proposed approach to answer the
> issues they raised in the  Complete Response letter. Happily,

42

1    we were satisfied with that meeting and had most of our data

2    really in hand already, which is why we were able to do – I

3    don't if this is a record, but it was certainly fast. In less than

4    three weeks, we were able to turnaround a resubmission

5    following that meeting, and filed that with the FDA on June

6    29, which we subsequently announced in July had been

7    accepted, with a new PDUFA date assigned of December 29

8    of this year.

9    99.    Defendant Pfeffer's statements were materially false and/or

10   misleading when made because he knew:

11   (a)    The FDA did not give MannKind at the June 9 end-of-review

12   meeting, or at any other time "agreement on [MannKind's]

13   proposed response to answer the issues they raised in the Complete

14   Response letter" by resubmitting the NDA for Dreamboat

15   AFREZZA instead of MedTone D AFREZZA.

16   (b)    MannKind did not "have in hand" at the meeting, and still does not

17   possess, data sufficient to support approval of Dreamboat

18   AFREZZA.

19   (c)    Defendants were only able to achieve the speed that Pfeffer boasted

20   about by skipping crucial clinical trials without which Dreamboat

21   AFREZZA could not be approved.

22   100.    On November 4, 2010, MannKind disclosed that John Arditi, then

23   Senior Worldwide Director of Regulatory Affairs, filed a lawsuit alleging fraud

24   and scientific misconduct in at least two Eastern European clinical sites tainting

25   data that MannKind submitted to the FDA as part of its NDA.

26   101.    According to the lawsuit, almost a year earlier Arditi had warned

27   Patricia Mayer, MannKind's Vice-President of Regulatory Affairs, that Arditi

28   

43

First Amended Verified Consolidated
Derivative Complaint

Case No. 11-cv-05003-GAF-SSx

and Margaret Galluzzi, Vice President of Clinical Operations, had confirmed audit concerns regarding potential fraud and scientific misconduct in connection with a Russian clinical site that was part of the studies submitted in MannKind's NDA. Specifically, Arditi indicated that he observed all patients in Dr. Yuri G. Shvartz's site in Russia had consistent blood pressure readings over several months, even though it would be expected that blood pressure should vary from time to time, indicating potential protocol violations and/or fraudulent study results, including the possibility of fictitious patients and/or that the site did not properly document potential safety issues in connection with AFREZZA.

102. Mr. Arditi also raised problems to Mayer regarding a Bulgarian clinical site that was part of the AFREZZA trials and the tainted data from which was included in the NDA submitted to the FDA. The audit of this site, known as the Daskalova site, conceded that: "There were numerous critical and significant findings... It appeared there was inadequate oversight of the [Principal Investigator] specifically with regard protocol adherence, Investigational Product (IP), source documentation, safety reporting, study delegation, submission of required documentation to the Ethics Committees, and study organization, possibly impacting data integrity at the site."

103. The audit of the Daskalova site also revealed that Dr. Daskalova did not have adequate oversight over AFREZZA with regard to treatment arm assignment, drug accountability, verification of subject compliance and accurate dispensing. In fact, it could not even be confirmed that the clinical trial subjects were on the correct assigned treatment arm, and there appeared to be fraudulent documentation, including records from the site that patients had received clinical trial kits from the site, when the packing slips indicated that those kits were not even delivered to the site until weeks or even months later. Dr. Daskalova could not explain these discrepancies.

44

104. The Daskalova audit further revealed that it could not even be confirmed that the patients who were enrolled in the site had met the necessary requirements for inclusion in the study, or that patients had been provided with the safety information required by the clinical study protocol. Further, according to the audit, it was impossible to determine whether safety tests had been performed on patients and that the integrity of the data could not be confirmed. The audit also found that "Accurate safety reporting over the study period of three years could not be confirmed."

105. According to Arditi, a follow up audit of Daskalova's site also revealed potential fraud in connection with patient enrollment in the AFREZZA trial. Specifically, although the protocol required that initial meetings with patients were to be individual meetings, several patient consent forms had the same date and time. Mr. Arditi concluded that this discrepancy, which Dr. Daskalova could not explain, indicates "potential fictitious and fraudulent patient enrollment."

106. For over a year, the Individual Defendants concealed from investors that there were problems with the Shvartz and Daskalova clinical sites and, as a result, problems with the data submitted to the FDA. Nor, according to Mr. Arditi, did the Individual Defendants report this adverse information to the FDA.

107. When the Individual Defendants finally disclosed the Arditi lawsuit, the November 4, 2010 press release was materially false and/or misleading because it omitted that the FDA would have to investigate the accusations raised therein, likely delaying approval even if MannKind had provided sufficient evidence in support of its 2010 NDA resubmission.

108. On December 28, 2010, the Individual Defendants caused MannKind to issue a press release announcing that the Company had received notification from the FDA that it was unable to complete the review of the NDA

45

First Amended Verified Consolidated    Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

1    for AFREZZA by the action date of December 29, 2010. The FDA stated it

2    would require an additional four weeks to complete its review.

3        109.    On January 12, 2011, MannKind participated at the JP Morgan

4    Healthcare Conference during which Defendant Mann stated:

> Our product AFREZZA addresses this market. We think it's a
> blockbuster or even super blockbuster potential. It's
> addressing an enormous opportunity and it really addresses
> the problems with the current insulins very effectively. It's a
> first in a new class of insulins, which we call ultra-rapid
> acting insulins. They're delivered through a very convenient
> easy to use inhalation system.
>
> ****
>
> We've studied this in an enormous number of trials, over 50
> trials, well over 5,000 patients and we've not seen a single
> safety signal...

18        110.    Defendant Mann's statements were materially false and/or

19    misleading when made because he knew that the commercial prospects of

20    AFREZZA were contingent upon U.S. approval, but the FDA could not approve

21    the drug product because the Company had not provided the data legally required

22    to warrant approval. Following these statements, MannKind's stock increased

23    from $8.71 per share on January 11, 2011 to $9.40 per share by January 13,

24    2011.

25        111.    The Individual Defendants had access to material nonpublic

26    information from:

First Amended Verified Consolidated        Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

(a)    their participation in the pre-NDA meeting with the FDA in 2008, or the information they received from the other Individual Defendants that did participate in that meeting, regarding the FDA's requirement that bioequivalence be established by meaningful *in vivo* clinical trials;

(b)    the official FDA minutes to the pre-NDA meeting;

(c)    their communications with the FDA regarding Study 138 which the Company claimed to be designed as a collaborative effort between itself and the FDA;

(d)    their November 2009 communications with the FDA regarding the next-generation inhaler;

(e)    the letter purportedly received from the FDA following the November 2009 conversations;

(f)    the full text of the CRL received by the Defendants in March 2010 rejecting the initial NDA, *inter alia*, for failure to include proper evidence of bioequivalence;

(g)    participation in the EOR meeting in June 9, 2010, in which the FDA did not agree to accept Study 142 as proof of bioequivalence;

(i)    their knowledge that they lacked the minutes of the June 9, 2010 meeting necessary to establish any agreements they claimed to have been reached therein;

(j)    the contents of the March 2009 NDA and the July 2010 NDA resubmission, including the actual studies presented therein; and

(k)    all other correspondence and communications with the FDA.

This information, which was known by or available to the Individual Defendants and not disclosed to shareholders rendered the Individual Defendants' statements materially false and/or misleading.

47

### E.    The Truth Emerges

112.    On January 18, 2011, MannKind received a second CRL notifying it that the FDA refused to approve AFREZZA on the basis of its 2010 NDA resubmission, and requesting that the Company undertake two lengthy and expensive Phase III clinical trials with the new inhaler, adding an additional arm or cohort to one of the two trials utilizing MedTone C AFREZZA, to develop controlled bridging data in diabetes patients.  The Individual Defendants waited until the next day to disclose this notice. By withholding this material information, MannKind's stock continued to trade above $10 per share on January 18, 2011.

113.    On the same day, January 18, 2011, Defendant Pfeffer, the Company's CFO, sold 6,300 shares of his own MannKind stock for $10.00 per share.

114.    Rumors of the second CRL began to emerge in the market in the late afternoon of January 18, 2011 and continued the following morning, January 19, 2011. Trading was halted around noon on January 19, 2011, and remained halted for the remainder of the day.

115.    That afternoon, with trading still halted, the Individual Defendants issued a press release entitled "MannKind Corporation Receives Complete Response Letter from the FDA for AFREZZA®," which stated in part:

> MannKind Corporation today announced that it has received a
> complete response letter from the U.S. Food & Drug
> Administration (FDA) regarding the New Drug Application
> (NDA) for AFREZZA® (insulin human [rDNA origin])
> Inhalation Powder for the treatment of adult patients with
> type 1 and type 2 diabetes for the control of hyperglycemia. A
> complete response letter is issued by the FDA's Center for

48

Drug Evaluation and Research when the review of a file is completed and questions remain that preclude the approval of the NDA in its current form.

The principal issue raised by the FDA concerned the usage of *in vitro* performance data and clinical pharmacology data to bridge MannKind's next-generation inhaler to the phase 3 trials conducted using its MedTone® inhaler. The FDA has requested that MannKind conduct two clinical trials with the next-generation inhaler (one in patients with type 1 diabetes and one in patients with type 2 diabetes), with at least one trial including a treatment group using the MedTone inhaler in order to obtain a head-to-head comparison of the data for the two devices. In the complete response letter, the FDA stated that after an adequate titration of study medication there should be at least twelve weeks of relatively stable insulin dosing at the end of the treatment period.

\*\*\*\*

"As we reported last fall, we have already begun a series of studies of the next-generation device in patients with type 1 (Affinity 1) and type 2 (Affinity 2) diabetes," said Alfred Mann, Chairman and Chief Executive Officer of MannKind Corporation. "Consistent with the direction we received in the complete response letter, these trials are designed to focus on careful titration of insulin dose and include at least twelve weeks of stable dosing. We plan to meet with the agency as quickly as possible in order to be confident that these trials,

49

with appropriate modifications to incorporate a comparison to the MedTone device, will suffice in addressing the agency's questions about patient use and robustness of the next-generation device."

116. On a conference call that day, Mann stated: "In our recent mission last June, we proposed to market AFREZZA using a new patient-friendly next-generation inhaler. The FDA noted that we attempted to rely on in vitro performance data, and a clinical pharmacology grid to the Phase 3 trials conducted with the MedTone inhaler, but indicated that this approach was inadequate." This directly contradicted the Individual Defendants' previous assurances that the FDA had "bless[ed]," "vetted," "approved," "accepted," and "agree[d]" to the same approach. Mann attempted to soften the blow by suggesting that any additional requirements could be satisfied by slightly modifying Affinity 1 and 2 studies. An analyst asked if those trials were proceeding or would be temporarily suspended, adding to the delay. Mann assured that the studies would not be halted.

117. An analyst at R.W. Baird & Co. called the Company's attempt to pass off inadequate data in support of its new inhaler design to be a "regulatory shortcut." Forbes.com called MannKind the "poster child for the dangers of FDA secrecy," questioning why the Company had simply not shared with investors the CRLs it received from the FDA.

118. When shares resumed trading on January 20, 2011, MannKind's stock plunged over $4.00 to reach an intraday low of $5.00, before rebounding slightly to close at $6.17 per share on January 20, 2011. This one-day decline of 32% (based on closing price) was on record volume of over 34 million shares. Over the next few days, MannKind sank back towards its January 20, 2011 low, and traded primarily in a $5-5.50 range.

50

First Amended Verified Consolidated              Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

119. On February 10, 2011, after the market closed, the Individual Defendants revealed that the costs and delays resulting from MannKind's "regulatory shortcut" would be substantially worse than it had earlier admitted. The Individual Defendants conceded:

    (a)   that although nearly three weeks had passed, MannKind had not even asked the FDA to schedule a meeting to discuss how the Company should proceed;

    (b)   that the two clinical trials, Affinity 1 and 2, that MannKind stated in January were underway and ongoing were in fact halted and would not be restarted until after the Company met with the FDA;

    (c)   that after they restarted the two clinical trials – a process which in itself could take months – it would take at least an additional 14-15 months to enroll patients, complete the trials, and prepare a revised NDA; and

    (d)   that MannKind did not have sufficient funds to cover the delayed additional trials and did not know how it was going to raise more funds.

On the disclosure of this additional bad news, MannKind shares dropped from $5.06 to $3.79 on more than five times average volume.

## V.   INSIDER SELLING ALLEGATIONS

120. Defendant Pfeffer made good use of his inside knowledge that MannKind received a notice from the FDA on January 18, 2011 rejecting Dreamboat AFREZZA. Although MannKind waited until the next day to disclose this notice, Pfeffer sold 6,300 shares of his own MannKind stock for $10.00 per share on January 18, 2011.

51

First Amended Verified Consolidated Derivative Complaint

Case No. 11-cv-05003-GAF-SSx

121.  Pfeffer's sales of MannKind stock were made on the basis of material, nonpublic information such that Pfeffer received a material benefit that other shareholders did not receive.

## VI.    DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.    Fiduciary Duties

122.  By reason of their positions as officers, directors and/or fiduciaries of MannKind and because of their ability to control the business and corporate affairs of MannKind, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage MannKind in a fair, just, honest, and equitable manner.    The Individual Defendants were and are required to act in furtherance of the best interests of MannKind and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

123.  Each director and officer of the Company owes to MannKind and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

### B.    Audit Committee Duties

124.  In addition to these duties, the Audit Committee Defendants owed specific duties to MannKind under the Audit Committee's Charter in fulfilling

First Amended Verified Consolidated        Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

the Board's oversight responsibilities with respect to the Company's corporate accounting and financial reporting processes, the systems of internal control over financial reporting and audits of financial statements as well as the quality and integrity of the Company's financial statements and reports.  In particular, the Audit Committee's Charter provided as follows:

**RESPONSIBILITIES**

10.    *Quarterly Results.* To review with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements prior to public disclosure of quarterly financial information, if practicable, or filing with the Securities and Exchange Commission of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under standards of the Public Company Accounting Oversight Board (United States).

11.    *Management's Discussion and Analysis.* To review with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the Securities and Exchange Commission.

12.    *Press Releases.* To review with management and the Auditors, as appropriate, earnings press releases.

13.    *Accounting Principles and Policies.* To review with management and the Auditors significant issues that arise regarding accounting   principles   and   financial   statement   presentation,

53

First Amended Verified Consolidated           Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

including critical accounting policies and practices, alternative accounting policies available under generally accepted accounting principles (*"GAAP"*) related to material items discussed with management and any other significant reporting issues and judgments.

**14.    *Risk Assessment and Management.*** To review with management and the Auditors, as appropriate, the Company's guidelines and policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures.

\*\*\*

**19.    *Internal Control Over Financial Reporting.*** To confer with management and the Auditors, as appropriate, regarding the scope, adequacy and effectiveness of the Company's internal control over financial reporting, including any special audit steps taken in the event of material control deficiencies, the responsibilities, budget and staff of the internal audit function and the appointment or replacement of the senior internal audit executive or manager.

\*\*\*

**22.    *Ethical Compliance.*** To review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and rules as well as to its Code of Ethical, including review

54

and approval of every transaction with a related person that must be disclosed by the Company pursuant to Item 404(a) of Regulation S-K of the Securities and Exchange Commission.

## C.    Code Of Business Conduct And Ethics

125.    The Company has also adopted a Code of Business Conduct and Ethics, which has been in effect for several years. Every employee, officer, and director is required to read and understand the Code and its application to the performance of their duties. The Code imposes specific duties on the Company's directors and officers, including:

### 1.    Honest and Ethical Conduct

It is the policy of MannKind to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of MannKind depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity.

### 2.    Legal Compliance

Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee's operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. We hold periodic training sessions to ensure that all employees comply with the relevant laws, rules and regulations associated with their employment, including laws prohibiting insider trading (which are discussed in further detail in

55

Section 3 below). While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you do have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your supervisor or the Compliance Officer (listed in Section 16).

Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as MannKind, to civil and/or criminal penalties. You should be aware that conduct and records, including emails, are subject to internal and external audits, and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal and ethical obligations.

## 3. Insider Trading

Employees who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business. All non-public information about MannKind or about companies with which we do business is considered confidential information. To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical, it is illegal. Employees must exercise the utmost care when handling material inside information.

56

9.     **Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting**

The integrity of our records and public disclosure depends on the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees, stockholders and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:

- no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities, or misclassifies any transactions as to accounts or accounting periods;

- transactions be supported by appropriate documentation;

- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;

57

- employees comply with our system of internal controls; and

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the SEC. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about MannKind that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- no employee may take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

First Amended Verified Consolidated Derivative Complaint

Case No. 11-cv-05003-GAF-SSx

- all employees must cooperate fully with our Accounting Department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information 8 necessary to make the disclosure in any of our reports accurate in all material respects.

Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor, the Compliance Officer or one of the other compliance resources described in Section 16.

**D.    Control, Access, And Authority**

126.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of MannKind, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by MannKind.

127.    Because of their advisory, executive, managerial, and directorial positions with MannKind, each of the Individual Defendants had access to adverse, non-public information about the financial conditions, operations, and

59

improper representations of MannKind, including information regarding the FDA's evaluation of AFREZZA.

128.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of MannKind, and was at all times acting within the course and scope of such agency.

**E.    Reasonable And Prudent Supervision**

129.    To discharge their duties, the officers and directors of MannKind were required to exercise reasonable and prudent supervision over the management, policies, practices and internal controls of the Company. By virtue of such duties, the officers and directors of MannKind were required to, among other things:

(a)    refrain from acting upon material inside corporate information to benefit themselves;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)    remain informed as to how MannKind conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and

60

take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f) ensure that MannKind was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## VII.  BREACHES OF DUTIES

130.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of MannKind, the absence of good faith on their part, and a reckless disregard for their duties to MannKind and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to MannKind.

131.  The Individual Defendants each breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements regarding the Company's efforts to obtain FDA approval of Dreamboat AFREZZA by establishing bioequivalence between Dreamboat AFREZZA and MedTone C AFREZZA, the results of MannKind's bioequivalence tests, and the FDA's purported agreement in advance to accept MannKind's data as proof of bioequivalence. As a result, MannKind has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## VIII.  CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

132.  In committing the wrongful acts alleged herein, the Doe Defendants and the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Doe Defendants and the

61

First Amended Verified Consolidated          Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

1   Individual Defendants further aided and abetted and/or assisted each other in
2   breaching their respective duties.

3       133.   During all times relevant hereto, the Doe Defendants and the
4   Individual Defendants collectively and individually initiated a course of conduct
5   that was designed to and did conceal the truth about the Company's efforts to
6   obtain FDA approval of Dreamboat AFREZZA by establishing bioequivalence
7   between Dreamboat AFREZZA and MedTone C AFREZZA, the results of
8   MannKind's bioequivalence tests, and the FDA's purported agreement in
9   advance to accept MannKind's data as proof of bioequivalence. In furtherance
10  of this plan, conspiracy, and course of conduct, the Doe Defendants and the
11  Individual Defendants collectively and individually took the actions set forth
12  herein.

13      134.   The Doe Defendants and the Individual Defendants engaged in a
14  conspiracy, common enterprise, and/or common course of conduct. The purpose
15  and effect of the Doe Defendants and the Individual Defendants' conspiracy,
16  common enterprise, and/or common course of conduct was, among other things,
17  to: (i) disguise the Individual Defendants' violations of law, including breaches
18  of fiduciary; and (ii) disguise and misrepresent the Company's future business
19  prospects.

20      135.   The Doe Defendants and the Individual Defendants accomplished
21  their conspiracy, common enterprise, and/or common course of conduct by
22  causing the Company to purposefully, recklessly, or negligently release improper
23  statements. Because the actions described herein occurred under the authority of
24  the Board, each of the Doe Defendants and the Individual Defendants was a
25  direct, necessary, and substantial participant in the conspiracy, common
26  enterprise, and/or common course of conduct complained of herein.

27

28

First Amended Verified Consolidated          Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

136.   Each of the Doe Defendants and the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each of the Doe Defendants and the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## IX.   DAMAGES TO MANNKIND

137.   As a result of the Doe Defendants and the Individual Defendants' wrongful conduct, MannKind disseminated false financial statements which failed to disclose issues with AFREZZA and the FDA's evaluation of the product.   The improper statements have devastated MannKind's credibility. MannKind is now the subject of a class action lawsuit in the United States District Court for the Central District of California, alleging violations of securities laws in connection with the improper reporting, false statements, and material omissions.  The Company will face substantial costs in connection with that lawsuit.

138.   As a direct and proximate result of the Doe Defendants and the Individual Defendants' actions as alleged above, MannKind's market capitalization has been substantially damaged.  The Company's stock has lost over $600 million, or more than 50% of its market capitalization.

139.   Further, as a direct and proximate result of the Doe Defendants and the Individual Defendants' conduct, MannKind has expended and will continue to expend significant sums of money, including:

(a)   costs incurred in investigating and defending MannKind and certain officers and directors in the class action lawsuit, plus

63

1    potentially hundreds of millions of dollars in settlement or to satisfy an adverse

2    judgment; and

3              (b)    costs incurred from the loss of the Company's

4    customers' confidence in MannKind's products.

5       140.  Moreover, these actions have irreparably damaged MannKind's

6    corporate image and goodwill. For at least the foreseeable future, MannKind

7    will suffer from what is known as the "liar's discount," a term applied to the

8    stocks of companies who have been implicated in illegal behavior and have

9    misled the investing public, such that MannKind's ability to raise equity capital

10   or debt on favorable terms in the future is now impaired.

11   **X.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

12      141.  Plaintiff brings this action derivatively in the right and for the

13   benefit of MannKind to redress injuries suffered, and to be suffered, by

14   MannKind as a direct result of breaches of fiduciary duty, abuse of control, gross

15   mismanagement, and insider selling, as well as the aiding and abetting thereof,

16   by the Individual Defendants.  MannKind is named as a Nominal Defendant

17   solely in a derivative capacity.  This is not a collusive action to confer

18   jurisdiction on this Court that it would not otherwise have.

19      142.  Plaintiff will adequately and fairly represent the interests of

20   MannKind in enforcing and prosecuting its rights.

21      143.  Plaintiff was a shareholder of MannKind at the time of the

22   wrongdoing of which Plaintiff complains and has continuously held stock in the

23   Company at all relevant times.

24      144.  The Board of MannKind currently consists of the following nine

25   individuals:  Cohen, Consiglio, Friedman, Kresa, MacCallum, Nordhoff,

26   Shannon, Mann, and Edstrom.

27

28
                                        64

First Amended Verified Consolidated        Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

## A.   Demand Is Futile As To Defendant Mann

145.   Defendant Mann faces a substantial likelihood of liability for his individual misconduct.   Mann is a named defendant in a federal class action pending in the Central District of California (*Mui v. MannKind Corporation, et al.,* Case No. 11-cv-00929-GAF-SSx) alleging that he and the Company violated §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 when he disseminated or approved false statements.   Recently, the court in that action denied Defendants' motion to dismiss, finding that the plaintiff had adequately stated a claim showing that Mann made certain false and misleading statements in violation of federal securities laws.

146.   If Defendant Mann pursued these derivative claims, then that would expose his own misconduct in the class action for violations of the federal securities laws.   This, in turn, would impair the defense of the class action and greatly increase the probability of Defendant Mann's personal liability in the class action.   As such, Defendant Mann is fatally conflicted, and therefore, unable to render a disinterested decision as to whether the Company should pursue these derivative claims.   Thus, demand is futile as to Defendant Mann.

147.   Additionally, Defendant Mann is not independent because he is the founder, Chairman of the Board, and Chief Executive Officer of MannKind. Defendant Mann is also a majority shareholder.   As of April 2011, Defendant Mann controlled 51,435,709 shares, or 39.4% of the outstanding common stock. According to relevant portions of the Company's 2011 proxy statement, Defendant Mann is not independent under applicable NASDAQ rules.   The Company also acknowledges that in connection with certain Board of Directors' meetings, the Company utilizes Mann's private aircraft.   Thus, the Individual Defendants concede that Defendant Mann cannot independently consider a demand.

First Amended Verified Consolidated              Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

148. Further, Defendant Mann's principal professional occupation is his employment with MannKind, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. For instance, Mann received a base salary in 2010 of $750,000, a bonus of $375,000, $273,373 in restricted stock awards, and 215,000 stock options. Accordingly, Defendant Mann cannot disinterestedly consider a demand.

149. Additionally, Defendant Mann is not independent because he has loaned substantial amounts of money to the Company. In October 2007, the Company entered into a $350 million loan arrangement with Mann. Under the arrangement, the Company could borrow up to a total of $350 million. As of December 31, 2010, the outstanding debt MannKind owed Mann was $235.5 million. Thus, because Defendant Mann is financially intertwined with the Company, he could not independently consider a demand.

150. Further, Defendant Mann is not independent because he is obligated to purchase a substantial number of MannKind shares under certain conditions. In August 2010, the Company entered into an agreement with Mann that would convert a portion of the massive debt the Company owed him into an equal amount of MannKind shares. Under the agreement, Mann is obligated to acquire the same number of shares of the Company's stock that Seaside purchases on each closing date under the Seaside agreement. This agreement could potentially obligate Mann to acquire over $100 million of new MannKind shares. Thus, because of Defendant Mann's financial arrangement with the Company, he could not independently consider a demand.

151. Additionally, Defendant Mann is not disinterested because he faces a substantial likelihood of liability for issuing the false and misleading statements. Defendant Mann knew the truth about the Company's efforts to obtain FDA approval of Dreamboat AFREZZA by establishing bioequivalence

66

First Amended Verified Consolidated
Derivative Complaint

Case No. 11-cv-05003-GAF-SSx

between Dreamboat AFREZZA and MedTone C AFREZZA, the results of MannKind's bioequivalence tests, and the FDA's purported agreement in advance to accept MannKind's data as proof of bioequivalence. Accordingly, Defendant Mann breached his fiduciary duty to MannKind shareholders for withholding material information and disseminating false and misleading statements. Since he faces a substantial likelihood of liability, he cannot disinterestedly consider a demand.

### B.    Demand Is Futile As To Defendant Edstrom

152.    Defendant Edstrom faces a substantial likelihood of liability for his individual misconduct. Edstrom is a named defendant in the federal class action pending in the Central District of California alleging that he and the Company violated §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 when he disseminated or approved false statements. Recently, the court in that action denied Defendants' motion to dismiss, finding that the plaintiff had adequately stated a claim showing that Edstrom made certain false and misleading statements in violation of federal securities laws.

153.    If Defendant Edstrom pursued these derivative claims, then that would expose his own misconduct in the class action for violations of the federal securities laws. This, in turn, would impair the defense of the class action and greatly increase the probability of Defendant Edstrom's personal liability in the class action. As such, Defendant Edstrom is fatally conflicted, and therefore, unable to render a disinterested decision as to whether the Company should pursue these derivative claims. Thus, demand is futile as to Defendant Edstrom.

154.    Additionally, Defendant Edstrom is not independent because he is the President and Chief Operating Officer of the Company. According to relevant portions of the Company's 2011 proxy statement, Defendant Edstrom is not independent under applicable NASDAQ rules. Thus, the Individual

First Amended Verified Consolidated        Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

1    Defendants concede that Defendant Edstrom cannot independently consider a
2    demand.

3        155.  In addition, Defendant Edstrom's principal professional occupation
4    is his employment with MannKind, pursuant to which he has received and
5    continues to receive substantial monetary compensation and other benefits.  For
6    instance, Edstrom received a base salary in 2010 of $540,000, a bonus of
7    $270,000, $253,211 in restricted stock awards, and 210,000 stock options.
8    Accordingly, Defendant Edstrom cannot disinterestedly consider a demand.

9        156.  Further, Defendant Edstrom is not disinterested because he faces a
10    substantial likelihood of liability for issuing the false and misleading statements.
11    Defendant Edstrom knew the truth about the Company's efforts to obtain FDA
12    approval of Dreamboat AFREZZA by establishing bioequivalence between
13    Dreamboat AFREZZA and MedTone C AFREZZA, the results of MannKind's
14    bioequivalence tests, and the FDA's purported agreement in advance to accept
15    MannKind's data as proof of bioequivalence.  Accordingly, Defendant Edstrom
16    breached his fiduciary duty to MannKind shareholders for withholding material
17    information and disseminating false and misleading statements.  Since he faces a
18    substantial likelihood of liability, he cannot disinterestedly consider a demand.

19        **C.    Demand Is Futile As To Defendant MacCallum**

20        157.  Demand is futile as to Defendant MacCallum because he faces a
21    substantial likelihood of liability for breach of fiduciary duties for authorizing
22    and/or failing to correct materially misleading statements made by certain of the
23    Individual Defendants on behalf of MannKind.  As a director of the Company,
24    Defendant MacCallum has a fiduciary duty to ensure that public material
25    statements about and on behalf of MannKind are true, and he has a duty to
26    correct any such statement that is not true or is misleading.  This fiduciary duty
27    extends not only to written statements in SEC filings or press releases, but also to

68

First Amended Verified Consolidated              Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

oral statements made by MannKind's officers or directors in public forums such as conference calls, interviews, and investor conferences. In this case, Defendant MacCallum knew that numerous statements made by Mann and others in public healthcare investors conferences – statements made for the express purpose of inducing investment in the Company's stock – were materially misleading. His failure to take corrective action was a breach of fiduciary duty.

158.    However, if Defendant MacCallum claims not to have known about these materially misleading statements, then this failure is also a breach of fiduciary duty.   AFREZZA is MannKind's sole core product, and securing financing for that product has been a paramount concern of the Company since its founding.   If Defendant MacCallum did not know about these numerous misleading statements about AFREZZA then he is liable for utterly abdicating his oversight duties.   Such please for "ostrick-like immunity" do not absolve Defendant MacCallum or any of the other Director Defendants of liability.

159.    Plaintiff has carefully reviewed each of MannKind's public SEC filings, press releases, conference call transcripts, and healthcare investor conference presentation transcripts from the relevant time period.   On the basis of that research, and on information and belief, Plaintiff makes the following allegations:

160.    Defendant MacCallum knew about the misleading statements about AFREZZA made at the healthcare investors conferences described above, either by reviewing and approving these prepared statements in advance or by reviewing the audio and/or written transcripts of these statements available, among other places, on MannKind's website, shortly thereafter.   Perhaps more than any other member of the Board, Defendant MacCallum was aware of these investor conferences.   As stated in MannKind's 2010 and 2011 definitive proxy statements, MacCallum is the Managing Partner of Outer Islands Capital, a

69

First Amended Verified Consolidated
Derivative Complaint

Case No. 11-cv-05003-GAF-SSx

hedge fund specializing in health care investments. Prior to joining this hedge fund, MacCallum served as the Global Head of Health Care investment banking for Salomon Smith Barney, the Executive Vice President and Head of the Health Care group at ING Barings Furman Selz LLC, an investment banking firm, and as the founder of the Life Sciences group at UBS Securities, an investment banking firm. This highly particularized expertise in health care investment banking would have been critically important to Defendants Mann, Pfeffer, Richardson, and others as they prepared their presentations and remarks for the numerous healthcare investment conferences they attended. Many of these conferences were held by the investment branch of large banks similar to the ones Defendant MacCallum served, or health care related hedge funds similar to the one MacCallum currently runs. Using this experience, MacCallum helped the Individual Defendants prepare their presentations, offered substantive guidance and approved of these presentations (and their false statements) in advanced, and/or carefully monitored the presentations.

161. In fact, MannKind specifically states that "[t]he Board believes Mr. MacCallum's knowledge and understanding of accounting and finance, [and] his business experience in the investment banking industry . . . provide our Board with valuable operational expertise . . ." Thus, Defendant MacCallum sits on MannKind's Board specifically to monitor and offer guidance regarding MannKind's attempts to secure funding from, among others, private health care investment funds.

162. In addition to his highly relevant investment banking expertise, MacCallum also was aware of these conferences and the statements made at them on behalf of MannKind because AFREZZA is MannKind's sole core product, as evidenced by the following facts:

First Amended Verified Consolidated Derivative Complaint                    Case No. 11-cv-05003-GAF-SSx

a) Since its founding, MannKind has devoted substantially all of its operational resources on the research, development, testing, marketing, and submission for regulatory approval of AFREZZA;

b) MannKind has admitted that it will not record any commercial sales of any product "prior to regulatory approval and commercialization of AFREZZA," and that failure to receive this regulatory approval will cast "substantial doubt [on] our ability to continue as a going concern"; and

c) For 2010, MannKind stated that it had only "two corporate objectives": 1) "Sign a partnership agreement for AFREZZA; and 2) Receive approval of . . . AFREZZA."

163. Moreover, securing funding for AFREZZA research and development has been a paramount focus of MannKind's officers and directors for years. As MannKind's own public filings state, the Company is "in the development stage as its primary activities since incorporation," and as a result "has reported net accumulated losses of $1.7 billion" since beginning to develop and test AFREZZA. Because MannKind cannot yet offer AFREZZA for commercial sale, the Company's "capital resources" consist primarily of loan agreements with Mann and securities purchased by investors. The Individual Defendants also admitted very candidly in the Company's August 2, 2010, Form 10-Q that, "if the Company is not successful in raising additional capital through equity or debt financing . . . there will be substantial doubt about its ability to continue as a going concern."

164. Therefore, as evidenced by the same public filings that Defendant MacCallum and the other Director Defendants reviewed and authorized for filing on behalf of MannKind, Defendant MacCallum is knowledgeable of and well aware of significant developments with AFREZZA, including particularly

71

First Amended Verified Consolidated Derivative Complaint          Case No. 11-cv-05003-GAF-SSx

1    significant efforts by the Company to secure additional funding for AFREZZA-

2    related work.

3        165.  Following the FDA's March 2010 CRL rejecting AFREZZA and

4    the subsequent negative effects on the Company's stock price, the Individual

5    Defendants  caused  MannKind  to  engage  in  a  full-scale  marketing  and

6    fundraising campaign to support the Company's renewed efforts to secure

7    approval of Dreamboat AFREZZA.  In particular, over a period of five months

8    from May 2010 through September 2010, Defendants Mann, Pfeffer, Richardson,

9    and others attended at least fourteen healthcare investors conferences specifically

10   to discuss the regulatory approval process of Dreamboat AFREZZA and secure

11   investments in the Company.   This significant AFREZZA-related fundraising

12   campaign, for which MannKind devoted substantial resources by sending CEO

13   Mann[6], CFO Pfeffer, and other very high-ranking executives as representatives,

14   is exactly the type of Company activity with which Defendant MacCallum and

15   the other Director Defendants were intimately aware.

16       166.  Defendant MacCallum and the other Director Defendants were

17   aware of these investor conferences for the additional reason that MannKind

18   published press releases in advance of each of these conferences on its Company

19   website, and, on information and belief, each executive officer and director

20   received notification of these press releases.

21       167.  Moreover, Defendant MacCallum was aware not only that these

22   conferences were taking place, but also was aware of what Defendants Mann and

23   others were saying at these conferences.   Over a period of five months,

24   Defendants Mann, Pfeffer, and Richardson made similar prepared remarks about

25   ────────────────────

26   [6] In fact, as described above, the Individual Defendants felt these conferences to
     be so important that Defendant Mann, the CEO and founder of MannKind,
     attended one such conference on June 9, 2010, rather than attend the FDA's

27   formal end-of-review meeting to discuss Study 142, potentially the most
     important meeting in the Company's history.

28                                          72

1  AFREZZA that were broadcast live and for which audio and written transcription
2  of the remarks were available on MannKind's website and elsewhere.  These
3  prepared remarks were so significant to the Company's efforts to secure critical
4  funding for its core product (and to keep the Company's doors open), and were
5  so similarly scripted, that Defendant MacCallum and the other Director
6  Defendants either reviewed and approved drafts of these statements in advance,
7  listened to the statements live as they were being made, or reviewed them on the
8  Company's website or elsewhere shortly after they were made.  To not do so
9  would have been extremely reckless and a complete abdication of Defendant
10  MacCallum's fiduciary duties.

11        168.  Finally, Defendant MacCallum not only knew about the content of
12  these statements, but he also knew that they were materially misleading when
13  made.  Each of the statements described above contained one or more of the
14  following material misstatements:

15              a)  That the FDA had "pre-approved" the techniques and
16              methodology for Study 142 in advance of the Study, perhaps as
17              early as November 2009;

18              b) That Study 142 established bioequivalence; and

19              c) That the FDA accepted Study 142 as "proof" of bioequivalence.

20  As demonstrated above, none of these statements was true when made.

21        169.  Defendant MacCallum knew that these statements were materially
22  misleading when made because each of them concerned the most significant
23  existing issue facing MannKind and its sole core product throughout 2010 –
24  securing FDA regulatory approval of AFREZZA.  MannKind admitted to having
25  only two goals in 2010, one of which was securing FDA approval for
26  AFREZZA.  Moreover, in 2010, MannKind engaged in only one significant
27  project to secure that approval – Study 142.  Therefore, Defendant MacCallum

28
                                    73

and the other Director Defendants were intimately aware of conversations and meetings with the FDA concerning Study 142 and its ability (or lack thereof) to satisfy the regulatory approval process.

170. As just one example, Defendant MacCallum knew that there could not have been any November 2009 "pre-approval" by the FDA of a study clinically testing Dreamboat AFREZZA, because MannKind had not even finalized the Dreamboat inhaler. Securing approval for a study for a product that had not even been completed was a factual impossibility.

171. Defendant MacCallum also knew, at a minimum, that any statements concerning the FDA's purported November 2009 "pre-approval" of Study 142 or its purported June 9, 2009, acceptance of Study 142 as "proof" of bioequivalence were materially misleading because Defendant MacCallum and the other Director Defendants were regularly briefed on any and all formal communications with the FDA, including CRLs and in person meetings. This fact is evidenced by MannKind's many public SEC filings summarizing in detail all of the Company's significant communications with the FDA, filings which Defendant MacCallum and the other Director Defendants reviewed and approved.

172. Defendant MacCallum and the other Director Defendants also knew about the progress of Study 142 and its ability (or lack thereof) to secure regulatory approval from the FDA based on Defendant Friedman's knowledge of the FDA approval process and Defendants Friedman's and Shannon's clinical testing expertise. These Director Defendants briefed the Board as a whole on Study 142's progress and approval prospects, thereby alerting the Director Defendants to the materially misleading nature of the statements.

173. For these reasons, Defendant MacCallum knew about the materially misleading statements, and he knew that they were materially misleading when

74

First Amended Verified Consolidated Derivative Complaint

Case No. 11-cv-05003-GAF-SSx

made. His failure to take action to publicly correct them was a breach of fiduciary duty, for which he faces a substantial likelihood of liability. Therefore demand is futile as to this director.

### D.   Demand Is Futile As To Defendant Friedman

174. Demand is futile as to Defendant Friedman because he faces a substantial likelihood of liability for breach of fiduciary duties for authorizing and/or failing to correct materially misleading statements made by certain of the Individual Defendants on behalf of MannKind. As a director of the Company, Defendant Friedman has a fiduciary duty to ensure that public material statements about and on behalf of MannKind are true, and he has a duty to correct any such statement that is not true or is misleading. This fiduciary duty extends not only to written statements in SEC filings or press releases, but also to oral statements made by MannKind's officers or directors in public forums such as conference calls, interviews, and investor conferences. In this case, Defendant Friedman knew that numerous statements made by Mann and others in public healthcare investors conferences – statements made for the express purpose of inducing investment in the Company's stock – were materially misleading. His failure to take corrective action was a breach of fiduciary duty.

175. However, if Defendant Friedman claims not to have known about these materially misleading statements, then this failure is also a breach of fiduciary duty. AFREZZA is MannKind's sole core product, and securing financing for that product has been a paramount concern of the Company since its founding. If Defendant Friedman did not know about these numerous misleading statements about AFREZZA then he is liable for utterly abdicating his oversight duties. Such please for "ostrich-like immunity" do not absolve Defendant Friedman or any of the other Director Defendants of liability.

75

176.  Plaintiff has carefully reviewed each of MannKind's public SEC filings, press releases, conference call transcripts, and healthcare investor conference presentation transcripts from the relevant time period.  On the basis of that research, and on information and belief, Plaintiff makes the following allegations:

177.  Because of AFREZZA's status as MannKind's sole core product, the fact that financing for AFREZZA has been a critical concern for the Company for years, and the fact that MannKind devoted substantial resources to a fundraising blitz in 2010, Defendant Friedman knew about the misleading statements about AFREZZA made at the healthcare investors conferences described above.  Defendant Friedman either reviewed these prepared statements in advance or reviewed the audio and/or written transcripts of these statements available, among other places, on MannKind's website, shortly thereafter.  Thus, Defendant Friedman knew the statements were misleading and breached his fiduciary duty by failing to correct them.  If Defendant Friedman failed even to review these statements, then he also breached his fiduciary duty by failing to correct them.  If Defendant Friedman failed even to review these statements, then he also breached his fiduciary duties by utterly abdicating his oversight responsibilities.

178.  Defendant Friedman and the other Director Defendants were aware of these investor conferences for the additional reason that MannKind published press releases in advance of each of these conferences on its Company website, and, on information and belief, each executive officer and director received notification of these press releases.

179.  Defendant Friedman and the other Director Defendants also were aware of these conferences, and the contents of Defendants Mann's, Pfeffer's, and Richardson's presentations, because of Defendant MacCallum's expertise in

76

1  healthcare investment banking and his likely briefing to the Board on

2  MannKind's efforts to secure investments from healthcare investment firms.

3      180. Moreover, Defendant Friedman was aware not only that these

4  conferences were taking place, but also was aware of what the Individual

5  Defendants were saying at these conferences. Over a period of five months,

6  Defendants Mann, Pfeffer, Richardson, and others made similar prepared

7  remarks about AFREZZA that were broadcast live and for which audio and

8  written transcription of the remarks were available on MannKind's website and

9  elsewhere. These prepared remarks were so significant to the Company's efforts

10  to secure critical funding for its core product (and to keep the Company's doors

11  open), and were so similarly scripted, that Defendant Friedman and the other

12  Director Defendants either reviewed and approved drafts of these statements in

13  advance, listened to the statements live as they were being made, or reviewed

14  them on the Company's website or elsewhere shortly after they were made. To

15  not do so would have been extremely reckless and a complete abdication of

16  Defendant Friedman's fiduciary duties.

17      181. Finally, Defendant Friedman not only knew about the content of

18  these statements, but he also knew that they were materially misleading when

19  made. Each of the statements described above contained one or more of the

20  following material misstatements:

21          a) That the FDA had "pre-approved" the techniques and methodology

22          for Study 142 in advance of the Study, perhaps as early as November

23          2009;

24          b) That Study 142 established bioequivalence; and

25          c) That the FDA accepted Study 142 as "proof" of bioequivalence.

26  As demonstrated above, none of these statements was true when made.

27

28                         77

182.  Defendant Friedman knew that these statements were materially misleading when made because each of them concerned the most significant existing issue facing MannKind and its sole core product throughout 2010 – securing FDA regulatory approval of AFREZZA.  MannKind admitted to having only two goals in 2010, one of which was securing FDA approval for AFREZZA.  Moreover, in 2010, MannKind engaged in only one significant project to secure that approval – Study 142.  Therefore, Defendant Friedman and the other Director Defendants were intimately aware of conversations and meetings with the FDA concerning Study 142 and its ability (or lack thereof) to satisfy the regulatory approval process.

183.  Moreover, Defendant Friedman was particularly aware of the progress of Study 142, and its ability (or lack thereof) to secure regulatory approval for Dreamboat AFREZZA.  As MannKind's 2010 and 2011 definitive proxies state, Friedman is a medical doctor with significant clinical research experience, having served as an executive at "a leading clinical and research center specializing in cancer and diabetes."  Friedman also served as the Deputy Commissioner for Operations for the FDA from 1995 to 1999, including serving as Acting Commissioner and Lead Deputy Commissioner from 1997 to 1998.  MannKind admits that "his service at the Food and Drug Administration . . . provide our Board with valuable scientific and operational expertise . . ."  Therefore, Defendant Friedman would have been intimately knowledgeable not only about the scientific progress of Study 142 but also the regulatory requirements of the FDA.

184.  As a result, and because his service on the Board provides value specifically because of his past experience, Friedman kept abreast of the one significant clinical trial taking place at MannKind in 2010 – Study 142.  Thus, he knew the following:

First Amended Verified Consolidated
Derivative Complaint

Case No. 11-cv-05003-GAF-SSx

a) Study 142 was not a "bioequivalency study" and did not "show bioequivalence," but was instead just a "pharmacology grid" of healthy (non-diabetic) patients.

b) Because study 142 was performed only on normal healthy adults, it was not designed to and could not possibly demonstrate that diabetes patients who inhaled Dreamboat AFREZZA experienced the same pharmacokinetic effects as patients that inhaled MedTone C AFREZZA.

c) Study 142 demonstrated that Dreamboat AFREZZA and MedTone C AFREZZA required different doses to achieve the same pharmacokinetic effect, making it impossible for MannKind to satisfy the regulatory standard for demonstrating bioequivalence.

d) MannKind had no *in vitro* clinical data showing that diabetes patients who inhaled Dreamboat AFREZZA experienced the same pharmacokinetic effects as MedTone C AFREZZA, and thus could not meet the *in vitro* study requirements for showing bioequivalence that the FDA had made clear would be necessary at least as early as the pre-NDA meeting.

e) Statements suggesting that establishing bioequivalence between the different inhalers in Study 142 was less difficult than in other products are materially misleading.

185. Moreover, because of his past experience as an executive at the FDA, Friedman also knew that, as a result of these numerous flaws with Study 142, and particularly its failure to address *in vitro* study requirements outlined by the FDA's March 2010 CRL, there was no chance the FDA would approve Dreamboat AFREZZA on the basis of Study 142.

186. For these reasons, Defendant Friedman knew about the materially misleading statements, and he knew that they were materially misleading when

79

First Amended Verified Consolidated Derivative Complaint

Case No. 11-cv-05003-GAF-SSx

made.   His failure to take action to publicly correct them was a breach of fiduciary duty, for which he faces a substantial likelihood of liability.   Therefore demand is futile as to this director.

### E.   Demand Is Futile As To Defendant Shannon

187.   Demand is futile as to Defendant Shannon because he faces a substantial likelihood of liability for breach of fiduciary duties for authorizing and/or failing to correct materially misleading statements made by certain of the Individual Defendants on behalf of MannKind.   As a director of the Company, Defendant Shannon has a fiduciary duty to ensure that public material statements about and on behalf of MannKind are true, and he has a duty to correct any such statement that is not true or is misleading.   This fiduciary duty extends not only to written statements in SEC filings or press releases, but also to oral statements made by MannKind's officers or directors in public forums such as conference calls, interviews, and investor conferences.   In this case, Defendant Shannon knew that numerous statements made by Mann and others in public healthcare investors conferences – statements made for the express purpose of inducing investment in the Company's stock – were materially misleading.   His failure to take corrective action was a breach of fiduciary duty.

188.   However, if Defendant Shannon claims not to have known about these materially misleading statements, then this failure is also a breach of fiduciary duty.   AFREZZA is MannKind's sole core product, and securing financing for that product has been a paramount concern of the Company since its founding.   If Defendant Shannon did not know about these numerous misleading statements about AFREZZA then he is liable for utterly abdicating his oversight duties.   Such pleas for "ostrich-like immunity" do not absolve Defendant Shannon or any of the other Director Defendants of liability.

First Amended Verified Consolidated Derivative Complaint

Case No. 11-cv-05003-GAF-SSx

189. Plaintiff has carefully reviewed each of MannKind's public SEC filings, press releases, conference call transcripts, and healthcare investor conference presentation transcripts from the relevant time period. On the basis of that research, and on information and belief, Plaintiff makes the following allegations:

190. Because of AFREZZA's status as MannKind's sole core product, the fact that financing for AFREZZA has been a critical concern for the Company for years, and the fact that MannKind devoted substantial resources to a fundraising blitz in 2010, Defendant Shannon knew about the misleading statements about AFREZZA made at the healthcare investors conferences described above. Defendant Shannon either reviewed these prepared statements in advance or reviewed the audio and/or written transcripts of these statements available, among other places, on MannKind's website, shortly thereafter. Thus, Defendant Shannon knew the statements were misleading and breached his fiduciary duty by failing to correct them. If Defendant Shannon failed even to review these statements, then he also breached his fiduciary duties by utterly abdicating his oversight responsibilities.

191. Defendant Shannon and the other Director Defendants were aware of these investor conferences for the additional reason that MannKind published press releases in advance of each of these conferences on its Company website, and, on information and belief, each executive officer and director received notification of these press releases.

192. Defendant Shannon and the other Director Defendants also were aware of these conferences, and the contents of Defendants Mann's, Pfeffer's, and Richardson's presentations, because of Defendant MacCallum's expertise in healthcare investment banking and his likely briefing to the Board on MannKind's efforts to secure investments from healthcare investment firms.

81

First Amended Verified Consolidated
Derivative Complaint

Case No. 11-cv-05003-GAF-SSx

193. Moreover, Defendant Shannon was aware not only that these conferences were taking place, but also was aware of what Defendants Mann, Pfeffer, Richardson, and others were saying at these conferences. Over a period of five months, Defendants Mann, Pfeffer, and Richardson made similar prepared remarks about AFREZZA that were broadcast live and for which audio and written transcription of the remarks were available on MannKind's website and elsewhere. These prepared remarks were so significant to the Company's efforts to secure critical funding for its core product (and to keep the Company's doors open), and were so similarly scripted, that Defendant Shannon and the other Director Defendants either reviewed and approved drafts of these statements in advance, listened to the statements live as they were being made, or reviewed them on the Company's website or elsewhere shortly after they were made. To not do so would have been extremely reckless and a complete abdication of Defendant Shannon's fiduciary duties.

194. Finally, Defendant Shannon not only knew about the content of these statements, but he also knew that they were materially misleading when made. Each of the statements described above contained one or more of the following material misstatements:

a) That the FDA had "pre-approved" the techniques and methodology for Study 142 in advance of the Study, perhaps as early as November 2009;

b) That Study 142 established bioequivalence; and

c) That the FDA accepted Study 142 as "proof" of bioequivalence.

As demonstrated above, none of these statements was true when made.

195. Defendant Shannon knew that these statements were materially misleading when made because each of them concerned the most significant existing issue facing MannKind and its sole core product throughout 2010 – securing FDA regulatory approval of AFREZZA. MannKind admitted to having

82

First Amended Verified Consolidated
Derivative Complaint

Case No. 11-cv-05003-GAF-SSx

1   only two goals in 2010, one of which was securing FDA approval for
2   AFREZZA.   Moreover, in 2010, MannKind engaged in only one significant
3   project to secure that approval – Study 142.  Therefore, Defendant Shannon and
4   the other Director Defendants were intimately aware of conversations and
5   meetings with the FDA concerning Study 142 and its ability (or lack thereof) to
6   satisfy the regulatory approval process.

7       196.  Moreover, Defendant Shannon was particularly aware of the
8   progress of Study 142, and its ability (or lack thereof) to secure regulatory
9   approval for Dreamboat AFREZZA.  As MannKind's 2010 and 2011 definitive
10  proxies state, Shannon is a medical doctor with what MannKind characterizes as
11  "extensive experience in drug development."   Indeed, Defendant Shannon has
12  served as the Senior Vice President of Clinical Development for Sterling
13  Winthrop, Inc., as well as the Head of the Integration Office for Research and
14  Development at Novartis AG, among other senior clinical research titles.
15  Therefore, Defendant Shannon would have been intimately knowledgeable about
16  the scientific progress of Study 142 and its likely ability to demonstrate
17  bioequivalence between MedTone D and Dreamboat.  In fact, his service on the
18  MannKind Board would have required it, as the Company notes that his value to
19  the Board derives from his "extensive experience in drug development" and
20  "valuable scientific and operational expertise."

21      197.  As a result, Shannon kept abreast of the one significant clinical trial
22  taking place at MannKind in 2010 – Study 142.  Thus, he knew the following:

23          a) Study 142 was not a "bioequivalency study" and did not "show
24          bioequivalence," but was instead just a "pharmacology grid" of healthy
25          (non-diabetic) patients.

26          b) Because Study 142 was performed only on normal healthy adults, it was
27          not designed to and could not possibly demonstrate that diabetes patients

83

First Amended Verified Consolidated                Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

who inhaled Dreamboat AFREZZA experienced the same pharmacokinetic effects as patients that inhaled MedTone C AFREZZA.

c) Study 142 demonstrated that Dreamboat AFREZZA and MedTone C AFREZZA required different doses to achieve the same pharmacokinetic effect, making it impossible for MannKind to satisfy the regulatory standard for demonstrating bioequivalence.

d) MannKind had no *in vitro* clinical data showing that diabetes patients who inhaled Dreamboat AFREZZA experienced the same pharmacokinetic effects as MedTone C AFREZZA, and thus could not meet the *in vitro* study requirements for showing bioequivalence that the FDA had made clear would be necessary at least as early as the pre-NDA meeting.

e) Statements suggesting that establishing bioequivalence between the different inhalers in Study 142 was less difficult than in other products are materially misleading.

198. For these reasons, Defendant Shannon knew about the materially misleading statements, and he knew that they were materially misleading when made. His failure to take action to publicly correct them was a breach of fiduciary duty, for which he faces a substantial likelihood of liability. Therefore demand is futile as to this director.

**F.    Demand Is Futile As To Defendant Cohen**

199. Demand is futile as to Defendant Cohen because he faces a substantial likelihood of liability for breach of fiduciary duties for authorizing and/or failing to correct materially misleading statements made by certain of the Individual Defendants on behalf of MannKind. As a director of the Company, Defendant Cohen has a fiduciary duty to ensure that public material statements about and on behalf of MannKind are true, and he has a duty to correct any such

84

First Amended Verified Consolidated Derivative Complaint                    Case No. 11-cv-05003-GAF-SSx

statement that is not true or is misleading.  This fiduciary duty extends not only to written statements in SEC filings or press releases, but also to oral statements made by MannKind's officers or directors in public forums such as conference calls, interviews, and investor conferences.  In this case, Defendant Cohen knew that numerous statements made by Mann and others in public healthcare investors conferences – statements made for the express purpose of inducing investment in the Company's stock – were materially misleading.  His failure to take corrective action was a breach of fiduciary duty.

200.   However, if Defendant Cohen claims not to have known about these materially misleading statements, then this failure is also a breach of fiduciary duty.  AFREZZA is MannKind's sole core product, and securing financing for that product has been a paramount concern of the Company since its founding.  If Defendant Cohen did not know about these numerous misleading statements about AFREZZA then he is liable for utterly abdicating his oversight duties.  Such pleas for "ostrich-like immunity" do not absolve Defendant Cohen or any of the other Director Defendants of liability.

201.   Plaintiff has carefully reviewed each of MannKind's public SEC filings, press releases, conference call transcripts, and healthcare investor conference presentation transcripts from the relevant time period.  On the basis of that research, and on information and belief, Plaintiff makes the following allegations:

202.   Because of AFREZZA's status as MannKind's sole core product, the fact that financing for AFREZZA has been a critical concern for the Company for years, and the fact that MannKind devoted substantial resources to a fundraising blitz in 2010, Defendant Cohen knew about the misleading statements about AFREZZA made at the healthcare investors conferences described above.  Defendant Cohen either reviewed these prepared statements in

85

1    advance or reviewed the audio and/or written transcripts of these statements
2    available, among other places, on MannKind's website, shortly thereafter.  Thus,
3    Defendant Cohen knew the statements were misleading and breached his
4    fiduciary duty by failing to correct them.  If Defendant Cohen failed even to
5    review these statements, then he also breached his fiduciary duties by utterly
6    abdicating his oversight responsibilities.

7        203.  Defendant Cohen and the other Director Defendants were aware of
8    these investor conferences for the additional reason that MannKind published
9    press releases in advance of each of these conferences on its Company website,
10   and, on information and belief, each executive officer and director received
11   notification of these press releases.

12       204.  Defendant Cohen and the other Director Defendants also were
13   aware of these conferences, and the contents of the presentations, because of
14   Defendant MacCallum's expertise in healthcare investment banking and his
15   likely briefing to the Board on MannKind's efforts to secure investments from
16   healthcare investment firms.

17       205.  Defendant Cohen, in particular, was aware of these investor
18   conferences.   As stated in MannKind's 2010 and 2011 definitive proxy
19   statements, Cohen served as an executive for pharmaceutical giant Merck & Co.
20   for fifteen years, giving him special insight into the importance and uniqueness
21   of these healthcare investor conferences and companies' participation in them.
22   He also serves on the boards of Chugai Pharmaceutical Co. and Teva
23   Pharmacuetical Industries Ltd., two smaller healthcare companies similar in
24   some respects to MannKind.  In fact, MannKind specifically states that "[t]he
25   Board believes Mr. Cohen's business experience, including his experience as an
26   executive officer of Merck, and his service on other public company boards . . .
27   provide our Board with valuable operational expertise . . ."  Thus, Defendant
28

86

First Amended Verified Consolidated            Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

1    Cohen sits on MannKind's Board specifically to monitor and offer guidance

2    regarding MannKind's funding efforts.

3        206.  Moreover, Defendant Cohen was aware not only that these

4    conferences were taking place, but also was aware of what Defendants Mann,

5    Pfeffer, Richardson, and others were saying at these conferences.  Over a period

6    of five months, these Defendants made similar prepared remarks about

7    AFREZZA that were broadcast live and for which audio and written transcription

8    of the remarks were available on MannKind's website and elsewhere.  These

9    prepared remarks were so significant to the Company's efforts to secure critical

10   funding for its core product (and to keep the Company's doors open), and were

11   so similarly scripted, that Defendant Cohen and the other Director Defendants

12   either reviewed and approved drafts of these statements in advance, listened to

13   the statements live as they were being made, or reviewed them on the Company's

14   website or elsewhere shortly after they were made.  To not do so would have

15   been extremely reckless and a complete abdication of Defendant Cohen's

16   fiduciary duties.

17       207.  Finally, Defendant Cohen not only knew about the content of these

18   statements, but he also knew that they were materially misleading when made.

19   Each of the statements described above contained one or more of the following

20   material misstatements:

21           a) That the FDA had "pre-approved" the techniques and methodology for

22           Study 142 in advance of the Study, perhaps as early as November 2009;

23           b) That Study 142 established bioequivalence; and

24           c) That the FDA accepted Study 142 as "proof" of bioequivalence.

25   As demonstrated above, none of these statements was true when made.

26       208.  Defendant Cohen knew that these statements were materially

27   misleading when made because each of them concerned the most significant

28

87

First Amended Verified Consolidated          Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

1    existing issue facing MannKind and its sole core product throughout 2010 –

2    securing FDA regulatory approval of AFREZZA. MannKind admitted to having

3    only two goals in 2010, one of which was securing FDA approval for

4    AFREZZA.  Moreover, in 2010, MannKind engaged in only one significant

5    project to secure that approval – Study 142. Therefore, Defendant Cohen and the

6    other Director Defendants were intimately aware of conversations and meetings

7    with the FDA concerning Study 142 and its ability (or lack thereof) to satisfy the

8    regulatory approval process.

9        209.  Defendant Cohen and the other Director Defendants also knew

10   about the progress of Study 142 and its ability (or lack thereof) to secure

11   regulatory approval from the FDA based on Defendant Friedman's knowledge of

12   the FDA approval process and Defendants Friedman's and Shannon's clinical

13   testing expertise.  These Director Defendants briefed the Board as a whole on

14   Study 142's progress and approval prospects, thereby alerting the Director

15   Defendants to the materially misleading nature of the statements.

16       210.  For these reasons, Defendant Cohen knew about the materially

17   misleading statements, and he knew that they were materially misleading when

18   made.  His failure to take action to publicly correct them was a breach of

19   fiduciary duty, for which he faces a substantial likelihood of liability.  Therefore

20   demand is futile as to this director.

21       **G.    Demand Is Futile As To Defendant Nordhoff**

22       211.  Demand is futile as to Defendant Nordhoff because he faces a

23   substantial likelihood of liability for breach of fiduciary duties of loyalty and

24   good faith for permitting and/or failing to correct materially misleading

25   statements made by certain of the Individual Defendants on behalf of MannKind.

26   As a director of the Company, Defendant Nordhoff has a fiduciary duty to ensure

27   that public material statements about and on behalf of MannKind are true, and he

28                                                88

First Amended Verified Consolidated          Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

1   has a duty to correct any such statement that is not true or is misleading. This

2   fiduciary duty extends not only to written statements in SEC filings or press

3   releases, but also to oral statements made by MannKind's officers or directors in

4   public forums such as conference calls, interviews, and investor conferences. In

5   this case, Defendant Nordhoff knew that numerous statements made by Mann

6   and others in public healthcare investors conferences – statements made for the

7   express purpose of inducing investment in the Company's stock – were

8   materially misleading. His failure to take corrective action was a breach of

9   fiduciary duty.

10      212. However, if Defendant Nordhoff claims not to have known about

11  these materially misleading statements, then this failure is also a breach of

12  fiduciary duty. AFREZZA is MannKind's sole core product, and securing

13  financing for that product has been a paramount concern of the Company since

14  its founding. If Defendant Nordhoff did not know about these numerous

15  misleading statements about AFREZZA then he is liable for utterly abdicating

16  his oversight duties. Such pleas for "ostrich-like immunity" do not absolve

17  Defendant Nordhoff or any of the other Director Defendants of liability.

18      213. Plaintiff has carefully reviewed each of MannKind's public SEC

19  filings, press releases, conference call transcripts, and healthcare investor

20  conference presentation transcripts from the relevant time period. On the basis

21  of that research, and on information and belief, Plaintiff makes the following

22  allegations:

23      214. Because of AFREZZA's status as MannKind's sole core product,

24  the fact that financing for AFREZZA has been a critical concern for the

25  Company for years, and the fact that MannKind devoted substantial resources to

26  a fundraising blitz in 2010, Defendant Nordhoff knew about the misleading

27  statements about AFREZZA made at the healthcare investors conferences

28

First Amended Verified Consolidated            Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

1   described above.  Defendant Nordhoff either reviewed these prepared statements

2   in advance or reviewed the audio and/or written transcripts of these statements

3   available, among other places, on MannKind's website, shortly thereafter.  Thus,

4   Defendant Nordhoff knew the statements were misleading and breached his

5   fiduciary duty by failing to correct them.  If Defendant Nordhoff failed even to

6   review these statements, then he also breached his fiduciary duties by utterly

7   abdicating his oversight responsibilities.

8       215.  Defendant Nordhoff and the other Director Defendants were aware

9   of these investor conferences for the additional reason that MannKind published

10  press releases in advance of each of these conferences on its Company website,

11  and, on information and belief, each executive officer and director received

12  notification of these press releases.

13      216.  Defendant Nordhoff and the other Director Defendants also were

14  aware of these conferences, and the contents of the presentations, because of

15  Defendant MacCallum's expertise in healthcare investment banking and his

16  likely briefing to the Board on MannKind's efforts to secure investments from

17  healthcare investment firms.

18      217.  Defendant Nordhoff, in particular, was aware of these investor

19  conferences.    As stated in MannKind's 2010 and 2011 definitive proxy

20  statements, Nordhoff has served as an executive for pharmaceutical giant Pfizer,

21  Inc., as well as CEO for a small gene therapy company and CEO and Chairman

22  of the Board for a small clinical diagnostic and blood screening company.  It is

23  this "experience as a director and executive officer at pharmaceutical and biotech

24  companies" that MannKind claims provides the Board with Nordhoff's "valuable

25  operational expertise . . ."  Therefore, Nordhoff would have had special insight

26  into the importance and uniqueness of these healthcare investor conferences and

27  companies' participation in them.    Thus, Defendant Nordhoff sits on

28

90

First Amended Verified Consolidated          Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

1  MannKind's Board specifically to monitor and offer guidance regarding
2  MannKind's funding efforts.

3     218.  Moreover, Defendant Nordhoff was aware not only that these
4  conferences were taking place, but also was aware of what was said at these
5  conferences.  Over a period of five months, Defendants Mann, Pfeffer,
6  Richardson, and others made similar prepared remarks about AFREZZA that
7  were broadcast live and for which audio and written transcription of the remarks
8  were available on MannKind's website and elsewhere.  These prepared remarks
9  were so significant to the Company's efforts to secure critical funding for its core
10 product (and to keep the Company's doors open), and were so similarly scripted,
11 that Defendant Nordhoff and the other Director Defendants either reviewed and
12 approved drafts of these statements in advance, listened to the statements live as
13 they were being made, or reviewed them on the Company's website or elsewhere
14 shortly after they were made.  To not do so would have been extremely reckless
15 and a complete abdication of Defendant Nordhoff's fiduciary duties.

16    219.  Finally, Defendant Nordhoff not only knew about the content of
17 these statements, but he also knew that they were materially misleading when
18 made.  Each of the statements described above contained one or more of the
19 following material misstatements:

20      a)   That the FDA had "pre-approved" the techniques and methodology
21      for Study 142 in advance of the Study, perhaps as early as November
22      2009;

23      b) That Study 142 established bioequivalence; and

24      c) That the FDA accepted Study 142 as "proof" of bioequivalence.

25 As demonstrated above, none of these statements was true when made.

26    220.  Defendant Nordhoff knew that these statements were materially
27 misleading when made because each of them concerned the most significant

28

<center>91</center>

1   existing issue facing MannKind and its sole core product throughout 2010 –
2   securing FDA regulatory approval of AFREZZA. MannKind admitted to having
3   only two goals in 2010, one of which was securing FDA approval for
4   AFREZZA. Moreover, in 2010, MannKind engaged in only one significant
5   project to secure that approval – Study 142. Therefore, Defendant Nordhoff and
6   the other Director Defendants were intimately aware of conversations and
7   meetings with the FDA concerning Study 142 and its ability (or lack thereof) to
8   satisfy the regulatory approval process.

9        221. Defendant Nordhoff and the other Director Defendants also knew
10   about the progress of Study 142 and its ability (or lack thereof) to secure
11   regulatory approval from the FDA based on Defendant Friedman's knowledge of
12   the FDA approval process and Defendants Friedman's and Shannon's clinical
13   testing expertise. These Director Defendants briefed the Board as a whole on
14   Study 142's progress and approval prospects, thereby alerting the Director
15   Defendants to the materially misleading nature of the statements.

16        222. For these reasons, Defendant Nordhoff knew about the materially
17   misleading statements, and he knew that they were materially misleading when
18   made. His failure to take action to publicly correct them was a breach of
19   fiduciary duty, for which he faces a substantial likelihood of liability. Therefore
20   demand is futile as to this director.

21   **H.   Demand Is Futile As To Defendant Consiglio**

22
23        223. Demand is futile as to Defendant Consiglio because he faces a
24   substantial likelihood of liability for breach of fiduciary duties of loyalty and
25   good faith for permitting and/or failing to correct materially misleading
26   statements made by certain of the Individual Defendants on behalf of MannKind.
27   As a director of the Company, Defendant Consiglio has a fiduciary duty to
28   ensure that public material statements about and on behalf of MannKind are true,

92

First Amended Verified Consolidated          Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

1  and he has a duty to correct any such statement that is not true or is misleading.

2  This fiduciary duty extends not only to written statements in SEC filings or press

3  releases, but also to oral statements made by MannKind's officers or directors in

4  public forums such as conference calls, interviews, and investor conferences. In

5  this case, Defendant Consiglio knew that numerous statements made by Mann

6  and others in public healthcare investors conferences – statements made for the

7  express purpose of inducing investment in the Company's stock – were

8  materially misleading. His failure to take corrective action was a breach of

9  fiduciary duty.

10      224.  However, if Defendant Consiglio claims not to have known about

11  these materially misleading statements, then this failure is also a breach of

12  fiduciary duty. AFREZZA is MannKind's sole core product, and securing

13  financing for that product has been a paramount concern of the Company since

14  its founding. If Defendant Consiglio did not know about these numerous

15  misleading statements about AFREZZA then he is liable for utterly abdicating

16  his oversight duties. Such pleas for "ostrich-like immunity" do not absolve

17  Defendant Consiglio or any of the other Director Defendants of liability.

18      225.  Plaintiff has carefully reviewed each of MannKind's public SEC

19  filings, press releases, conference call transcripts, and healthcare investor

20  conference presentation transcripts from the relevant time period. On the basis

21  of that research, and on information and belief, Plaintiff makes the following

22  allegations:

23      226.  Because of AFREZZA's status as MannKind's sole core product,

24  the fact that financing for AFREZZA has been a critical concern for the

25  Company for years, and the fact that MannKind devoted substantial resources to

26  a fundraising blitz in 2010, Defendant Consiglio knew about the misleading

27  statements about AFREZZA made at the healthcare investors conferences

28

First Amended Verified Consolidated          Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

described above. Defendant Consiglio either reviewed these prepared statements in advance or reviewed the audio and/or written transcripts of these statements available, among other places, on MannKind's website, shortly thereafter. Thus, Defendant Consiglio knew the statements were misleading and breached his fiduciary duty by failing to correct them. If Defendant Consiglio failed even to review these statements, then he also breached his fiduciary duties by utterly abdicating his oversight responsibilities.

227. Defendant Consiglio and the other Director Defendants were aware of these investor conferences for the additional reason that MannKind published press releases in advance of each of these conferences on its Company website, and, on information and belief, each executive officer and director received notification of these press releases.

228. Defendant Consiglio and the other Director Defendants also were aware of these conferences, and the contents of the presentations, because of Defendant MacCallum's expertise in healthcare investment banking and his likely briefing to the Board on MannKind's efforts to secure investments from healthcare investment firms.

229. Defendant Consiglio, in particular, was aware of these investor conferences. As stated in MannKind's 2010 and 2011 definitive proxy statements, it is Consiglio's "understanding of . . . finance, [and] his experience as an . . . executive officer at financial services firms" that "provide our Board with valuable accounting, financial, and operational expertise." In 2010, no financial matter was more important to MannKind than securing additional investment to allow the Company to operate while it underwent another round of clinical testing for AFREZZA. For this reason, a number of MannKind's highest ranking officers devoted substantial time over five months attending at least fourteen investor conferences. As demonstrated by MannKind's proxy

94

statements, Defendant Consiglio sits on MannKind's Board specifically to monitor and offer guidance regarding such important financial matters for the Company.

230.   Moreover, Defendant Consiglio was aware not only that these conferences were taking place, but also was aware of what was said at these conferences.   Over a period of five months, Defendants Mann, Pfeffer, Richardson, and others made similar prepared remarks about AFREZZA that were broadcast live and for which audio and written transcription of the remarks were available on MannKind's website and elsewhere.   These prepared remarks were so significant to the Company's efforts to secure critical funding for its core product (and to keep the Company's doors open), and were so similarly scripted, that Defendant Consiglio and the other Director Defendants either reviewed and approved drafts of these statements in advance, listened to the statements live as they were being made, or reviewed them on the Company's website or elsewhere shortly after they were made.   To not do so would have been extremely reckless and a complete abdication of Defendant Consiglio's fiduciary duties.

231.   Finally, Defendant Consiglio not only knew about the content of these statements, but he also knew that they were materially misleading when made.   Each of the statements described above contained one or more of the following material misstatements:

a) That the FDA had "pre-approved" the techniques and methodology for Study 142 in advance of the Study, perhaps as early as November 2009;

b) That Study 142 established bioequivalence; and

c) That the FDA accepted Study 142 as "proof" of bioequivalence.

As demonstrated above, none of these statements was true when made.

232.   Defendant Consiglio knew that these statements were materially misleading when made because each of them concerned the most significant

95

1    existing issue facing MannKind and its sole core product throughout 2010 –

2    securing FDA regulatory approval of AFREZZA. MannKind admitted to having

3    only two goals in 2010, one of which was securing FDA approval for

4    AFREZZA. Moreover, in 2010, MannKind engaged in only one significant

5    project to secure that approval – Study 142. Therefore, Defendant Consiglio and

6    the other Director Defendants were intimately aware of conversations and

7    meetings with the FDA concerning Study 142 and its ability (or lack thereof) to

8    satisfy the regulatory approval process.

9    233. Defendant Consiglio and the other Director Defendants also knew

10   about the progress of Study 142 and its ability (or lack thereof) to secure

11   regulatory approval from the FDA based on Defendant Friedman's knowledge of

12   the FDA approval process and Defendants Friedman's and Shannon's clinical

13   testing expertise. These Director Defendants briefed the Board as a whole on

14   Study 142's progress and approval prospects, thereby alerting the Director

15   Defendants to the materially misleading nature of the statements.

16   234. For these reasons, Defendant Consiglio knew about the materially

17   misleading statements, and he knew that they were materially misleading when

18   made. His failure to take action to publicly correct them was a breach of

19   fiduciary duty, for which he faces a substantial likelihood of liability. Therefore

20   demand is futile as to this director.

21   **I.    Demand Is Futile As To Defendant Kresa**

22   235. Demand is futile as to Defendant Kresa because he faces a

23   substantial likelihood of liability for breach of fiduciary duties of loyalty and

24   good faith for permitting and/or failing to correct materially misleading

25   statements made by certain of the Individual Defendants on behalf of MannKind.

26   As a director of the Company, Defendant Kresa has a fiduciary duty to ensure

27   that public material statements about and on behalf of MannKind are true, and he

28

First Amended Verified Consolidated          Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

has a duty to correct any such statement that is not true or is misleading. This fiduciary duty extends not only to written statements in SEC filings or press releases, but also to oral statements made by MannKind's officers or directors in public forums such as conference calls, interviews, and investor conferences. In this case, Defendant Kresa knew that numerous statements made by Mann and others in public healthcare investors conferences – statements made for the express purpose of inducing investment in the Company's stock – were materially misleading. His failure to take corrective action was a breach of fiduciary duty.

236. However, if Defendant Kresa claims not to have known about these materially misleading statements, then this failure is also a breach of fiduciary duty. AFREZZA is MannKind's sole core product, and securing financing for that product has been a paramount concern of the Company since its founding. If Defendant Kresa did not know about these numerous misleading statements about AFREZZA then he is liable for utterly abdicating his oversight duties. Such pleas for "ostrich-like immunity" do not absolve Defendant Kresa or any of the other Director Defendants of liability.

237. Plaintiff has carefully reviewed each of MannKind's public SEC filings, press releases, conference call transcripts, and healthcare investor conference presentations from the relevant time period. On the basis of that research, and on information and belief, Plaintiff makes the following allegations:

238. Because of AFREZZA's status as MannKind's sole core product, the fact that financing for AFREZZA has been a critical concern for the Company for years, and the fact that MannKind devoted substantial resources to a fundraising blitz in 2010, Defendant Kresa knew about the misleading statements about AFREZZA made at the healthcare investors conferences

97

First Amended Verified Consolidated Derivative Complaint                    Case No. 11-cv-05003-GAF-SSx

1    described above. Defendant Kresa either reviewed these prepared statements in
2    advance or reviewed the audio and/or written transcripts of these statements
3    available, among other places, on MannKind's website, shortly thereafter. Thus,
4    Defendant Kresa knew the statements were misleading and breached his
5    fiduciary duty by failing to correct them. If Defendant Kresa failed even to
6    review these statements, then he also breached his fiduciary duties by utterly
7    abdicating his oversight responsibilities.

8        239. Defendant Kresa and the other Director Defendants were aware of
9    these investor conferences for the additional reason that MannKind published
10   press releases in advance of each of these conferences on its Company website,
11   and, on information and belief, each executive officer and director received
12   notification of these press releases.

13       240. Defendant Kresa and the other Director Defendants also were aware
14   of these conferences, and the contents of the presentations, because of Defendant
15   MacCallum's expertise in healthcare investment banking and his likely briefing
16   to the Board on MannKind's efforts to secure investments from healthcare
17   investment firms.

18       241. Moreover, Defendant Kresa was aware not only that these
19   conferences were taking place, but also was aware of what was said at these
20   conferences. Over a period of five months, Defendants Mann, Pfeffer,
21   Richardson, and others made similar prepared remarks about AFREZZA that
22   were broadcast live and for which audio and written transcription of the remarks
23   were available on MannKind's website and elsewhere. These prepared remarks
24   were so significant to the Company's efforts to secure critical funding for its core
25   product (and to keep the Company's doors open), and were so similarly scripted,
26   that Defendant Kresa and the other Director Defendants either reviewed and
27   approved drafts of these statements in advance, listened to the statements live as
28

First Amended Verified Consolidated          Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

1   they were being made, or reviewed them on the Company's website or elsewhere

2   shortly after they were made. To not do so would have been extremely reckless

3   and a complete abdication of Defendant Kresa's fiduciary duties.

4          242. Finally, Defendant Kresa not only knew about the content of these

5   statements, but he also knew that they were materially misleading when made.

6   Each of the statements described above contained one or more of the following

7   material misstatements:

8                a) That the FDA had "pre-approved" the techniques and methodology for

9          Study 142 in advance of the Study, perhaps as early as November 2009;

10               b) That Study 142 established bioequivalence; and

11               c) That the FDA accepted Study 142 as "proof" of bioequivalence.

12  As demonstrated above, none of these statements was true when made.

13         243. Defendant Kresa knew that these statements were materially

14  misleading when made because each of them concerned the most significant

15  existing issue facing MannKind and its sole core product throughout 2010 –

16  securing FDA regulatory approval of AFREZZA. MannKind admitted to having

17  only two goals in 2010, one of which was securing FDA approval for

18  AFREZZA. Moreover, in 2010, MannKind engaged in only one significant

19  project to secure that approval – Study 142. Therefore, Defendant Kresa and the

20  other Director Defendants were intimately aware of conversations and meetings

21  with the FDA concerning Study 142 and its ability (or lack thereof) to satisfy the

22  regulatory approval process.

23         244. Defendant Kresa and the other Director Defendants also knew about

24  the progress of Study 142 and its ability (or lack thereof) to secure regulatory

25  approval from the FDA based on Defendant Friedman's knowledge of the FDA

26  approval process and Defendants Friedman's and Shannon's clinical testing

27  expertise. These Director Defendants briefed the Board as a whole on Study

28

99

First Amended Verified Consolidated          Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

1   142's progress and approval prospects, thereby alerting the Director Defendants

2   to the materially misleading nature of the statements.

3       245.   For these reasons, Defendant Kresa knew about the materially

4   misleading statements, and he knew that they were materially misleading when

5   made.   His failure to take action to publicly correct them was a breach of

6   fiduciary duty, for which he faces a substantial likelihood of liability.   Therefore

7   demand is futile as to this director.

### J.    Demand Is Futile Because The Entire Board Is Beholden To Mann And Cannot Independently Consider A Demand

10      246.   As detailed above in ¶¶142-148, Defendant Mann is an interested

11  director.

12      247.   The Board cannot independently consider a demand to bring suit

13  against Defendant Mann because he is the founder, Chief Executive Officer,

14  majority shareholder, and controls the Board.   Defendant Mann has been a

15  director since April 1999, the Chairman of the Board since December 2001, and

16  the Chief Executive Officer since October 2003.   Defendant Mann has

17  effectively controlled the Company on a day-to-day basis via his position as a

18  majority shareholder, Chief Executive Officer, and Chairman of the Board.

19      248.   Specifically illustrative of his control over the Board, as of April

20  2011, Defendant Mann controlled 39.4% of the Company, or roughly 51 million

21  shares of MannKind stock.   In fact, Mann was ranked as 277th on Forbes 400

22  Wealthiest Americans in 2009.   Because of his significant holdings in the

23  Company, Defendant Mann has a stranglehold on the operations of the

24  Company.

25      249.   Defendant Mann could easily vote any dissenting Board member

26  out of office at the next election if a Board member voted to initiate suit against

27  him.   No MannKind Board member has the ability to outvote Defendant Mann.

First Amended Verified Consolidated          Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

1    As of April 2011, Edstrom owned 622,831 shares, Cohen owned 94,542 shares,
2    Consiglio owned 115,109 shares, Friedman owned 115,109 shares, Kresa owned
3    156,109 shares, MacCallum owned 109,275 shares, Nordhoff owned 97,609
4    shares, and Shannon owned 12,777 shares. Collectively, Defendants Edstrom,
5    Cohen, Consiglio, Friedman, Kresa, MacCallum, Nordhoff, and Shannon owned
6    1,323,361 shares, which pales in comparison to the 51 million shares owned by
7    Defendant Mann. Thus, Defendants Edstrom, Cohen, Consiglio, Friedman,
8    Kresa, MacCallum, Nordhoff, and Shannon have no voting power to elect
9    directors. They heavily rely on Defendant Mann for votes in all director
10   elections. Consequently, Defendants Edstrom, Cohen, Consiglio, Friedman,
11   Kresa, MacCallum, Nordhoff, and Shannon cannot exercise independent
12   business judgment in deciding whether to bring suit against Defendant Mann.

13   250. MannKind's own public filings demonstrate that Mann dominates
14   and controls not only the Company, but also the Board. As stated in numerous
15   public SEC filings, by virtue of Mann's stockholdings, Mann "can individually
16   control our direction and policies, and his interests may be adverse to the
17   interests of our other stockholders. . . . By virtue of his holdings, Mr. *Mann can
18   and will continue to be able to effectively control the election of the members
19   of our board of directors,* our management and our affairs and prevent corporate
20   transactions such as mergers, consolidations or the sale of all or substantially all
21   of our assets that may be favorable from our standpoint or that of our other
22   stockholders or cause a transaction that we or our other stockholders may view as
23   unfavorable." Thus, because Mann can effectively oust any director, no director
24   on MannKind's Board can independently consider a demand to bring suit against
25   Mann for fear of losing his or her position with the Company.

26   251. In addition, Defendant Mann regularly allows the other directors to
27   use his personal aircraft to attend MannKind Board meetings. Thus, Defendants

28
                                    101

First Amended Verified Consolidated          Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

1   Edstrom, Cohen, Consiglio, Friedman, Kresa, MacCallum, Nordhoff, and
2   Shannon are behold to Defendant Mann and cannot exercise independent
3   business judgment in deciding whether to bring suit against him.

4       252.   Further, Defendant Mann has agreed to provide loans to the
5   Company up to $350 million. As of December 31, 2010, the Company owed
6   Mann $235.5 million. The Board could not possibly independently consider to
7   bring suit against Mann because the Company has the ability to borrow an
8   additional $114.5 million from Mann. If the Board brought suit against Mann,
9   he might not provide the financing that the Company desperately needs to
10  continue its present operations.

11      253.   In addition, Defendant Mann entered into another agreement with
12  the Company that would convert a portion of the massive debt the Company
13  owes him into an equal amount of MannKind shares. This agreement could
14  improve MannKind's capital position by more than $100 million. The Board
15  would not want to disrupt this agreement by bringing suit against Defendant
16  Mann. Accordingly, Defendants Edstrom, Cohen, Consiglio, Friedman, Kresa,
17  MacCallum, Nordhoff, and Shannon cannot exercise independent business
18  judgment in deciding whether to bring suit against Defendant Mann.

19      **K.   Demand Is Futile As To All Of The Director Defendants For**
20      **Additional Reasons**

21      254.   Defendants Mann, Edstrom, Cohen, Consiglio, Friedman, Kresa,
22  MacCallum, Nordhoff, and Shannon had the responsibility to oversee and remain
23  aware of the Company's clinical trials of AFREZZA. The Company's stock
24  traded largely on the prospects of its lead product candidate, AFREZZA. Thus,
25  AFREZZA represented the Company's core product or business. As the
26  Company's principal product, and only product at the regulatory review stage,
27  AFREZZA was vital to the Company's profitability and survival. Indeed, when
28

                                    102

First Amended Verified Consolidated         Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

1   the information at issue pertains to a company's core business or service, as it
2   does here, knowledge of that information may be imputed to the entire board
3   through inference as a matter of law.   Thus, each of the members of the
4   MannKind Board are charged with having knowledge of the issues described
5   herein related to the Company's false and misleading statements related to
6   AFREZZA.

7      255.   The Director Defendants, as members of the MannKind Board, each
8   knew, failed to act in the face of a known duty to act, and/or were grossly
9   negligent when they allowed the Company to issue statements that failed to
10  disclose the truth about the Company's efforts to obtain FDA approval of
11  Dreamboat AFREZZA by establishing bioequivalence between Dreamboat
12  AFREZZA and MedTone C AFREZZA, the results of MannKind's
13  bioequivalence tests, and the FDA's purported agreement in advance to accept
14  MannKind's data as proof of bioequivalence.   Thus, demand is futile as to the
15  Director Defendants.

16     256.   The Director Defendants, as members of the MannKind Board, each
17  had a duty to ensure that reliable systems of financial controls and reporting were
18  in place at the Company and functioning properly.   MannKind, however, did not
19  accurately report the status of the FDA's review of AFREZZA.   The Director
20  Defendants each knew, failed to act in the face of a known duty to act, and/or
21  with gross negligence ignored the fact that the Company lacked adequate internal
22  controls.   Despite this, the Director Defendants took no steps to avert or correct
23  the situation.   The Company's lack of adequate internal controls allowed the
24  materially false and misleading information regarding the Company's financial
25  reporting to be disseminated to the investing public.   Thus, the Director
26  Defendants are each subject to a substantial likelihood of liability.   Thus, demand
27  is futile as to the Director Defendants.

28

First Amended Verified Consolidated          Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

257.  If MannKind's officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duties alleged in this Complaint by Directors and Officers Liability Insurance ("D&O Insurance), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders.   However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by MannKind against the Individual Defendants, known as the "insured versus insured exclusion."  As a result, if the Director Defendants were to sue themselves or certain of the officers of MannKind, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Director Defendants cannot be expected to file a derivative lawsuit because such a claim might not be covered under the Company's D&O insurance policy.

258.  Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting MannKind by prosecuting this action.    Therefore, demand on MannKind and its Board is futile and is excused.

259.  MannKind has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.   Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.    Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently

First Amended Verified Consolidated
Derivative Complaint

Case No. 11-cv-05003-GAF-SSx

1  substantial likelihood of liability for their breaches, rendering any demand upon
2  them futile.

### COUNT I

### Against All Defendants for Breach of Fiduciary Duty

260.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

261.  Defendants owed and owe MannKind fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe MannKind the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

262.  Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

263.  Defendants each knowingly, recklessly or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the FDA's review of AFREZZA.   These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

264.  As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, MannKind has sustained significant damages.  As a result of the misconduct alleged herein, these Defendants are liable to the Company.

265.  Plaintiff, on behalf of MannKind, has no adequate remedy at law.

First Amended Verified Consolidated    Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

## COUNT II

### Against Defendant Pfeffer for Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information

266.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

267.   At the time Defendant Pfeffer sold his MannKind stock, he knew the information described above, and sold MannKind stock on the basis of such information.

268.   The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.   It was a proprietary asset belonging to the Company, which Defendant Pfeffer used for his own benefit when he sold MannKind stock.

269.   At the time of his stock sales, Defendant Pfeffer knew that MannKind had received the FDA notice but had not yet disclosed the notice to the public.  Defendant Pfeffer's sales of MannKind stock while in possession and control of this material adverse, non-public information was a breach of his fiduciary duty of loyalty and good faith.

270.   Since the use of the Company's proprietary information for his own gain constitutes a breach of Defendant Pfeffer's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits he obtained thereby.

271.   Plaintiff, on behalf of MannKind, has no adequate remedy at law.

## COUNT III

### Against Defendant Pfeffer for Violation of Cal. Corp. Code § 25402

272.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106

First Amended Verified Consolidated Derivative Complaint                    Case No. 11-cv-05003-GAF-SSx

273.   At the time Defendant Pfeffer sold his MannKind common stock, he was an officer of MannKind whose relationship to MannKind gave him access, directly or indirectly, to material information about MannKind not generally available to the public.

274.   Defendant Pfeffer sold MannKind securities at a time when he knew material information about MannKind – gained from his relationship with MannKind – which would have significantly affected the market price of MannKind common stock and was not generally available to the public.

275.   Defendant Pfeffer knew these facts were not intended to be available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of MannKind common stock.

276.   Defendant Pfeffer had knowledge of material, adverse, non-public information and sold his MannKind common stock in violation of California Corporations Code § 25402.

277.   Defendant Pfeffer is liable to MannKind for damages in an amount up to three times the difference between the price at which the security was sold and the market value which the security would have had at the time of the sale if the information known to Defendant Pfeffer had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information – pursuant to California Corporations Code § 25502.5.

278.   On information and belief, Plaintiff alleges that MannKind has total assets in excess of one million dollars and has a class of equity security held of record by 500 or more persons.

279.   Defendant Pfeffer is also liable for reasonable attorney's fees and costs under California Corporations Code § 25502.5.

First Amended Verified Consolidated          Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

280. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

281. As a result of the misconduct alleged above, the Individual Defendants have caused MannKind to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

282. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

283. Plaintiff, on behalf of MannKind, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Unjust Enrichment

284. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

285. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of MannKind. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching their fiduciary duties owed to MannKind.

286. Plaintiff, as a shareholder and representative of MannKind, seeks restitution from the Individual Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and breach of fiduciary duty.

287. Plaintiff, on behalf of MannKind, has no adequate remedy at law.

First Amended Verified Consolidated Derivative Complaint      Case No. 11-cv-05003-GAF-SSx

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, and aiding and abetting breaches of fiduciary duty, violations of California Corporations Code §§ 25402, 25403, waste of corporate assets, and unjust enrichment;

B.    Directing MannKind to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect MannKind and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

- a proposal to strengthen the Board's supervision of the FDA's approval process for new products, including the disclosure of clinical trials to shareholders;

- a proposal to strengthen internal controls and policies concerning the FDA's approval process for new products;

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to permit the shareholders of MannKind to nominate at least two candidates for election to the Board;

109

First Amended Verified Consolidated    Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

- a proposal to ensure the accuracy of the qualifications of MannKind's directors, executives and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters; and

- a provision to appropriately test and then strengthen the internal audit and control functions;

C.    Awarding to MannKind restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

//

//

First Amended Verified Consolidated                Case No. 11-cv-05003-GAF-SSx
Derivative Complaint

XII.  **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: March 2, 2012

Respectfully Submitted,

JOHNSON & WEAVER, LLP

_[signature]_

SHAWN E. FIELDS

Lead Counsel for Plaintiff

111

## <u>VERIFICATION</u>

I, Donald Talley, hereby verify that I am a shareholder of MannKind Corporation (the "Company"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct. I have reviewed the allegations made in this First Amended Verified Consolidated Amended Shareholder Derivative Complaint and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

Date: 3/1/2012

Donald Talley

- 1 -